**In re Alan L. & Sandra L. KIRCHNER, Debtors.**

**Bankruptcy No. 97–33600–13.**

United States Bankruptcy Court, W.D. Wisconsin.

Dec. 29, 1997.

Galen W. Pittman, Hoffman, Pittman & Associates, La Crosse, WI, for Debtors.

Jay J. Pitner, Gray & End, Milwaukee, WI, for Union Planters Mortgage Co.

William W. Chatterton, Ross & Chatterton, Madison, WI, Trustee.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

In his dissent to *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), Justice Scalia stated that he had "the greatest sympathy for the Courts of Appeals who must predict which manner of statutory construction we shall use for the next Bankruptcy Code case." *Id.* at 435, 112 S.Ct. at 787 (Scalia, J., dissenting). I hope that Justice Scalia's sympathy extends to bankruptcy courts. This case appears to involve the reconciliation of three Supreme Court precedents[1] and the language of the Bankruptcy Code.

A recent law review article by Professors Lawrence Ponoroff and F. Stephen Knippenberg described the Bermuda Triangle of bankruptcy law we now enter. They summarized the problem as follows:

> Assume a debtor who owns real property with a current value of $100,000 subject to a lien securing an indebtedness of $150,000 that is currently in default. Before foreclosure can be initiated, the debtor files chapter 7, discharging all personal responsibility for the debt. Assuming no dividend to unsecured creditors (or that the creditor elects not to file in that capacity), the creditor emerges with an *in rem* claim for $150,000 (plus accrued interest). Because of

---

**1.** One of those precedents is the decision in which Justice Scalia made the quoted statement. The others are *Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) and *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

*Dewsnup,* the debtor would have been precluded from avoiding the underwater portion of the lien in the chapter 7 case. At this juncture, the creditor would be expected to commence foreclosure proceedings. However, before that can occur, the debtor now files a chapter 13 petition and in his plan proposes, in conformity with § 1325(a)(5), to pay to the mortgagee over the life of the plan the present value of $100,000.

Lawrence Ponoroff & F. Stephen Knippenberg, *The Immovable Object Versus the Irresistible Force: Rethinking the Relationship Between Secured Credit and Bankruptcy Policy,* 95 Mich.L.Rev. 2234, 2299–2300 n. 251 (1997). The resolution suggested by the authors is straightforward:

> Obviously, because of § 1322(b)(2) and the *Nobelman* decision, the strategy will not work where the lien is on the debtor's principal residence.... Barring that circumstance, the debtor has managed to pull off in two steps what *Dewsnup* prohibits accomplishing in one.

*Id.* (citation omitted).

■ The debtors in the instant case, Alan and Sandra Kirchner (the "Kirchners") seek confirmation of a chapter 13 plan which is the second step of a "chapter 20" bankruptcy targeting their principal residence. Unlike the hypothetical, after their chapter 7 discharge the Kirchners waited until a foreclosure judgment was entered before filing their chapter 13 case. Additionally, their chapter 13 plan proposes to sell the residence.[2] Union Planters Mortgage Company ("Union") objects. Union received a foreclosure judgment on the residence for $75,076.09, in which the Kirchners were given six months to redeem the property. The chapter 13 was filed approximately two weeks after the redemption period had run.[3] The parties have stipulated that the current value of the residence is $43,500.

If the Kirchners are allowed to pay only the current value of the residence, their plan would be feasible. If they are required to pay the amount of Union's judgment, the plan is not feasible and confirmation must be denied.

■ How the chapter 7 discharge affects what can be done in a subsequent chapter 13 case is not as obvious to me as it was to Professors Ponoroff and Knippenberg. In *Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), the Supreme Court considered "whether a debtor can include a mortgage lien in a Chapter 13 bankruptcy reorganization plan once the personal obligation secured by the mortgaged property has been discharged in a Chapter 7 proceeding." *Id.* at 80, 111 S.Ct. at 2152. The Court explicitly held the debtor could because "the mortgage lien in such a circumstance remains a 'claim' against the debtor that can be rescheduled under Chapter 13." *Id.* However, the Court did not directly address the amount of the claim or the continuing rights of the claimant.[4]

---

2. Specifically, the Kirchners plan to use the sale proceeds as well as a periodic payment until the sale to pay Union the agreed value of the residence. The parties apparently do not dispute that this is a payment "provided for by the plan" under § 1322(a)(5).

3. Under Wisconsin law, the Kirchners continued to hold an interest in the property even after the redemption period had run:

> Despite the judgment of foreclosure, the [debtors] still had an interest in the property at the time they filed their petition in bankruptcy, such that the property was part of the estate under 11 U.S.C. §§ 541 and 1307. Under Wisconsin law, a mortgagee has only a lien on the mortgaged property even after a judgment of foreclosure is entered. *Neither equitable nor legal title passes until the foreclosure sale is held.*

*In re Clark,* 738 F.2d 869, 871 (7th Cir.1984) (emphasis added).

4. In *Johnson,* the debtor had received a discharge under chapter 7 for personal liability on notes totaling $470,000 secured by mortgages on real property. The bank which held the mortgages sued and was granted "an *in rem* judgment of approximately $200,000." 501 U.S. at 80, 111 S.Ct. at 2152. Prior to any foreclosure sale, the debtor filed a chapter 13 petition. The debtor scheduled the *in rem* judgment as a chapter 13 claim, and planned to keep the property. *See id.* at 81, 111 S.Ct. at 2152–53. The bank objected because the debtor had no remaining personal liability on the notes, contending that the scheduling of the *in rem* debt was improper. In acknowledging the claim, the Court stated that "we have no trouble concluding that a mortgage interest that survives the discharge of a debtor's personal liability is a 'claim' within the terms of

The next year in *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the Supreme Court held that a chapter 7 discharge does not "strip down" to the value of the collateral a secured claim in real estate not administered in the case.[5] Justice Scalia, joined by Justice Souter, filed a strong dissent.[6] While this case has been subject to widespread criticism, it is still binding upon this court and will thus be treated with the appropriate deference.

The third case in the triangle was decided the next year. *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), considered "whether § 1322(b)(2)[7] prohibits a Chapter 13 debtor

§ 101(5)." *Id.* at 84, 111 S.Ct. at 2154. The Court stated that:

> Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a "right to payment" in the form of its right to the proceeds from the sale of the debtor's property. Alternatively, the creditor's surviving right to foreclose on the mortgage can be viewed as a "right to an equitable remedy" for the debtor's default on the underlying obligation. Either way, there can be no doubt that the surviving mortgage interest corresponds to an "enforceable obligation" of the debtor.

The Court also gave limited approval to the filing of "chapter 20" bankruptcy plans (the filing of a chapter 7 case, followed by a chapter 13 case involving the same debtor). In discussing the ban on certain types of serial filings, the Court stated that "[t]he absence of a like prohibition on serial filings of Chapter 7 and Chapter 13 petitions, combined with the evident care with which Congress fashioned these express prohibitions, convinces us that Congress did not intend categorically to foreclose the benefit of Chapter 13 reorganization to a debtor who previously has filed for Chapter 7 relief." *Id.* at 87, 111 S.Ct. at 2156. The Court did not reach the issues of whether the plan in question was feasible or had been filed in good faith. *Id.* at 88, 111 S.Ct. at 2156. Whatever else may be read into *Johnson*, at least one point is clear. A claim against a debtor's property is a claim against the debtor even after any personal obligation is discharged.

5. In *Dewsnup*, the Court confronted the issue of whether, in chapter 7, a debtor may " 'strip down' a creditor's lien on real property to the value of the collateral, as judicially determined, when that value is less than the amount of the claim secured by the lien?" 502 U.S. at 412, 112 S.Ct. at 775. The Court held "that § 506(d) does not allow [the debtor] to 'strip down' [the creditor's] lien, because [the creditor's] claim is secured by a lien and has been fully allowed pursuant to § 502." *Id.* at 417, 112 S.Ct. at 778. Furthermore, the Court stated that "[w]e think ... that the creditor's lien stays with the real property until the foreclosure." *Id.* The Court based this conclusion on the following view of the bargain between a debtor and a secured creditor:

> [The continuation of the lien until foreclosure] is what was bargained for by the mortgagor and the mortgagee. The voidness language sensibly applies only to the security aspect of

the lien and then only to the real deficiency in the security. Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain.

*Id.*

The majority also based its conclusion on what it determined to be the pre-Code practice in bankruptcy law. The Court stated that, despite language in the Code that could easily have been construed to require a contrary result, "Congress must have enacted the Code with a full understanding of this practice," citing a statement in the legislative history that "Subsection (d) [of § 506] permits liens to pass through the bankruptcy case unaffected." *Id.* at 419, 112 S.Ct. at 779 (quoting H.R.Rep. No. 95–595, p. 357 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6313).

6. Justice Scalia began his dissent noting that § 506(d) "unambiguously provides that to the extent a lien does not secure [an allowed secured] claim it is (with certain exceptions) rendered void." 502 U.S. at 420, 112 S.Ct. at 780 (Scalia, J., dissenting). Parsing the language of title 11, Justice Scalia concluded that the majority's position was unsupportable as it made:

> no attempt to establish a textual or structural basis for overriding the plain meaning of § 506(d), but rests its decision upon policy intuitions of a legislative character, and upon the principle that a text which is "ambiguous" (a status apparently achieved by being the subject of disagreement between self-interested litigants) cannot change pre-Code law without the *imprimatur* of "legislative history." Thus abandoning the normal and sensible principle that a term (and especially an artfully defined term such as "allowed secured claim") bears the same meaning throughout the statute, the Court adopts instead what might be called the one-subsection-at-a-time approach to statutory exegis.

*Id.* at 422–23, 112 S.Ct. at 781 (Scalia, J., dissenting) (footnote omitted).

7. Section 1322(b)(2) provides (emphasis added) that:

> (b) Subject to subsections (a) and (c) of this section, the plan may—

from relying on § 506(a)[8] to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence" and concluded "that it does." *Id.* at 325–26, 113 S.Ct. at 2108.[9]

So the triangle was complete. Under *Nobelman*, rights of a mortgagee in the principal residence may not be modified in a chapter 13 case other than by "statutory limitations on the lender's rights, ... [which] are independent of the debtor's plan or otherwise outside § 1322(b)(2)'s prohibition". *Id.* at 330, 113 S.Ct. at 2110. Under *Dewsnup*, the mortgage lien survives chapter 7 even if the debtor's personal liability for the mortgage debt is discharged. Finally, *Johnson* condones treating the *in rem* liability which is the residue of a chapter 7 discharge as a claim in a subsequent chapter 13 plan.

> (2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

8.  Section § 506(a) provides:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

9.  As the Court stated, § 1322(b)(2) provides "special protection for creditors whose claims are secured only by a lien on the debtor's home." *508 U.S. at 327, 113 S.Ct. at 2109.* The parties agreed that the language of § 1322(b)(2) does not permit modification of the rights of a creditor holding a security interest in a principal residence. But the debtors contended "that their Chapter 13 plan propose[d] no such modification. They argue[d] that the protection of § 1322(b)(2) applie[d] only to the extent the mortgagee [held] a 'secured claim' in the debtor's residence and that [the Court] must look first to § 506(a) to determine the value of the mortgagee's 'secured claim.'" *Id.* at 327–28, 113 S.Ct. at 2109. The debtor contended that the

The question which all this begs, but the one which is central to this case is: What "rights" does Union retain after the chapter 7, and does the Kirchners' plan propose to modify any of those rights? While a lien is retained by Union, what rights adhere to that lien after the personal liability of the debtor has been extinguished?

Clearly the chapter 7 discharge and not the chapter 13 plan has modified Union's rights in the most significant way. All Union now holds is an *in rem* judgment of foreclosure and whatever rights pertain thereto. While the Kirchners claim that in *Johnson* the "Court determined that the *in rem* claim against the real estate would be equal to the fair market value thereof," it "determined" no such thing.[10] Still, since the Kirchners have received a discharge from personal lia-

> unsecured portion of the claim could be modified.
>
> The Court held that the debtor's "interpretation fail[ed] to take adequate account of § 1322(b)(2)'s focus on 'rights.'" *Id.* The "rights" held by the secured creditor depend both on state law and the contract between the parties, and include "the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure." *Id.* at 329, 113 S.Ct. at 2110. The Court did not speculate on what might happen in a "chapter 20" case.

10. The Court recited that "the state court [had] entered an *in rem* judgment of approximately $200,000 for the Bank" on notes totaling "approximately $470,000," and that payments provided for by the plan were "equal in total value to the Bank's *in rem* judgment." 501 U.S. at 80–81, 111 S.Ct. at 2152. From this, the Kirchners' counsel apparently concluded that the foreclosure judgment was equal to the value of the property, and that the plan payments also equaled the value of the property. However, the *in rem* foreclosure judgment in *Johnson* appears to have been completely independent of the property's value. Only one of the Bank's several notes was secured and

> By the specific terms of the mortgage ... "the aggregate principal amount of the loan and advances" secured by the mortgage "shall at no time exceed" $100,000.... The terms of the mortgage are crystal clear; the mortgage was not intended to secure a principal amount,

bility, they are not required to make scheduled payments, are not subject to late charges or interest rate adjustments, and cannot be sued for a deficiency. Most of the rights enumerated in *Nobelman*, 508 U.S. at 329, 113 S.Ct. at 2110, do not apply after the chapter 7 discharge. Union's primary (and perhaps only) right is the right to foreclose, which was partially exercised when Union pursued and received the foreclosure judgment of $75,076.09.[11]

Confirmation of the Kirchners' plan to pay only the current value of the residence to Union could be viewed as taking away only Union's right to foreclose in the manner prescribed by Wisconsin law at the time of its own choosing, since if it receives current value of the property it receives the economic equivalent of a present foreclosure sale to a third party.[12] While *Nobelman* finds foreclosure to be a protected right, does the substitution of this economic equivalent impermissibly modify that right?

In *Dewsnup*, the Court stated that "the creditor's lien stays with the real property *until the foreclosure.*" 502 U.S. at 417, 112 S.Ct. at 778 (emphasis added). At another point in the case, the Court stated that "[a]ny increase over the judicially determined valuation *during the bankruptcy* rightly accrues to the benefit of the creditor." *Id.* (emphasis added). The Court in *Johnson* stated that "the creditor's surviving *right* to foreclose on the mortgage [after the chapter 7 discharge] can be viewed as a '*right* to an equitable remedy' for the debtor's default on the underlying obligation." 501 U.S. at 84, 111 S.Ct. at 2154 (emphasis added). Taken together, these statements suggest that the timing of the foreclosure is a right with which § 1322(b)(2) would be concerned. Moreover, in *Nobelman* the Court stated

that the bifurcation under § 506(a) of a claim "does not necessarily mean that the 'rights' the [secured creditor] enjoys as a mortgagee, which are protected by § 1322(b)(2), are limited by the valuation of its secured claim." 508 U.S. at 329, 113 S.Ct. at 2110.

As noted by the Court in *Nobelman*, state law and the contract between the parties determine the rights of a secured creditor. Foreclosure is a remedy dealt with in chapter 846 of the Wisconsin Statutes. An *in rem* foreclosure judgment may be awarded for more than the market value of the property. Such a judgment determines the balance due on the underlying loan, not the value of the property. *See* Wis.Stat.Ann. § 846.10, dealing with foreclosure (emphasis added):

> If the plaintiff recovers the judgment *shall* describe the mortgaged premises and *fix the amount of the mortgage debt then due* ... and shall adjudge that the mortgaged premises be sold for the payment of the amount then due and of all instalments which shall become due before the sale....

Prior to the sale which would be ordered under Wis.Stat.Ann. § 846.10, the Kirchners would have the right to redeem the property under Wis.Stat.Ann. § 846.13, which provides:

> The mortgagor, the mortgagor's heirs, personal representatives or assigns may redeem the mortgaged premises at any time before the sale by paying to the clerk of the court in which the judgment was rendered, or to the plaintiff, or any assignee thereof, the amount of such judgment, and any taxes paid by the plaintiff subsequent to the judgment upon the mortgaged premises, with interest from the date of payment, at the

whether the original loan or later advances, in excess of $100,000.
*Home State Bank v. Johnson,* 240 Kan. 417, 729 P.2d 1225, 1231–32 (1986).

**11.** It appears that Union could have sought and received relief from the stay under § 362(d)(2) at virtually any point after the chapter 13 filing. This would have allowed Union to continue the foreclosure process and proceed to sale of the property. Under § 362(d)(2), relief from the stay *shall* be granted if "the debtor does not have

equity" in the property and the "property is not necessary to an effective reorganization." In the instant case, the Kirchners admit they have no equity in the property. The Kirchners propose to sell the residence and pay Union with the proceeds of the sale, so the property is obviously not "necessary to an effective reorganization."

**12.** There may be reason to believe that a sale in bankruptcy is likely to yield a higher price than a foreclosure sale, but in light of the parties' stipulation as to value that supposition is unnecessary.

same rate. On payment to such clerk or on filing the receipt of the plaintiff or the plaintiff's assigns for such payment in the office of said clerk the clerk shall thereupon discharge such judgment, and a certificate of such discharge, duly recorded in the office of the register of deeds, shall discharge such mortgage of record to the extent of the sum so paid.

The Kirchners would have to pay "the amount of such [foreclosure] judgment," which would be equal to the underlying debt. That is true even as to an *in rem* judgment when the personal liability on the debt has been extinguished by a chapter 7 discharge. The Wisconsin Supreme Court stated that an individual who has received a discharge in bankruptcy "may not redeem mortgaged property under § 846.13 for its stripped down value." *Hobl v. Lord,* 162 Wis.2d 226, 229–30, 470 N.W.2d 265, 267 (1991). It also held "that a mortgagor may only redeem the mortgaged property under § 846.13 for the amount of the judgment entered in the foreclosure action." *Id.* at 230, 470 N.W.2d at 267 (footnote omitted).[13]

Even after a debtor has received a discharge of personal liability, Wisconsin law does not permit redemption unless the entire *foreclosure judgment,* not the market value of the property, is paid, *Id.* at 229–30, 470 N.W.2d at 267. This legal standard is supplemented by the practical effect of the mortgagee's right to credit bid the entire amount of the judgment at the foreclosure sale.

█ In the instant case, the Kirchners would have to pay the full amount of the judgment, $75,076.09, to redeem the property. If a foreclosure sale were held, Union could bid $75,076.09 without experiencing any real harm. But, even as the purchaser at the foreclosure sale, Union would presumably want or need to dispose of the property[14] by selling it to another party. So it is likely that Union would eventually receive only the current value of the property, which the parties have stipulated is $43,500. In other words, Union should be economically indifferent to holding a foreclosure sale based on the earlier judgment or the payment upon the sale proposed in the Kirchners' plan. However, Union clearly has the right under Wisconsin law to either have a sale held or to receive from the Kirchners the full amount of the underlying debt prior to confirmation of such sale. Whether Union's objection to being paid off in the Kirchners' plan arises from a wish to await further appreciation of the real estate has not been articulated. But for a belief that appreciation is likely to occur prior to the time at which the sale is held, there would be no apparent economic incentive to oppose a plan paying the present value of the real estate as stipulated between the parties.

Thus, it appears that Union is waiting in the hope that its *in rem* claim will eventually be paid in full at some later date and objects to having that wait ended.[15] There is no indication that the Kirchners presently have or ever will have the ability to redeem the property, and it is probable that Union will have to be satisfied with a payment equal to the value of this property. *Cf. In re Schaitz,* 913 F.2d 452, 454 (7th Cir.1990) (Judge Posner, in discussing chapter 13 generally, stated that "you cannot get water from a stone."). Thus, the right to foreclose possessed by Union would appear to give it an economic right that is realistically equal only to the intrinsic value of the property.

However, the view that a foreclosure remedy is mirrored by a "strip down" to current value has been criticized. *See Barry E.*

---

**13.** In *Hobl,* the foreclosure judgment of December 23, 1987 was for $127,959.59. 162 Wis.2d at 230, 470 N.W.2d at 267. The fair market value of the property at that time was agreed to be $50,000.00. *Id.* at 231 n. 6, 470 N.W.2d at 268 n. 6.

**14.** Even if governing regulations would permit it to, Union does not appear to want to hold this property. As noted earlier, Union chose not to foreclose during the period between the chapter 7 discharge and the filing of the chapter 13.

**15.** The state court foreclosure judgment held that "said premises shall be sold at public auction under the direction of the sheriff, at any time after six months from the date of entry of judgment." *Leader Fed. Bank for Savs. v. Kirchner,* No. 96–CV–79 at 3 (Wis.Cir.Ct. Jan. 6, 1997). Apparently the foreclosure sale was not scheduled promptly after this time period expired.

Adler, *Creditor Rights After Johnson and Dewsnup*, 10 Bankr.Dev.J. 1, 5 (1993) ("If the court's alternative 'merely duplicates' foreclosure, ... why have creditors spent time and effort to litigate the issue in *Johnson* and *Dewsnup* at every level up through the Supreme Court?"). This criticism is based upon the fear that courts are incapable of accurate valuation of property in chapter 13 cramdowns. "If [the property is valued correctly], Creditor would be as happy to receive that amount from Debtor as to collect it from a foreclosure sale, provided the redemption occurred at the same time as the foreclosure." *Id.* at 6. If Union actually believes (as it stipulated) that $43,500 is the correct value of the property, and the plan provides it would be received sooner than through foreclosure,[16] the reason it is contesting confirmation must not be solely economic.

No case has been cited or found where the debtors proposed to make a lump sum payment equal to the fair market value of the property. In other reported cases, payments equal to the fair market value of the residence were spread over the life of the proposed plan.[17] Unlike those cases, the "simulated foreclosure sale" proposed by the

Kirchners in the instant case would actually seem to benefit Union.[18]

Union's non-economic motive is not clear. It may not wish to see any precedent established that a chapter 20 plan can ever strip down the debt on a principal residence. It may harbor some animosity toward the Kirchners. The reason remains a mystery.

The very idea of chapter 20 cases—the filing of which was approved in at least some situations in *Johnson*—is to give debtors more relief than could be gained in either chapter 7 or chapter 13 standing alone. But to gain that relief all conditions for confirmation must be met. While the discussion so far has focused on whether the amount of Union's secured claim would render an otherwise confirmable plan infeasible, the Kirchners' plan is not otherwise confirmable even if the claim allowed under § 506(a) is only $43,500. The plan currently on file with this court provides for the payment of only $43,000 to Union.[19] But even if the plan were amended to pay $43,500, this would still be inadequate because no provision in the plan would yield a "present value" of $43,500 to Union.[20] Any sale under the plan will

---

**16.** Because Union has already received a foreclosure judgment, this is not entirely clear. A foreclosure sale might actually have been faster if relief from the stay had been sought. *See supra* note 11. The offer for the Kirchners' house was for only $43,000, not the stipulated value of $43,500. Therefore, a new agreement will have to be reached, although it seems likely that this will occur without much trouble. *See infra* note 18. In any event, by failing to exercise its right to public sale promptly after the end of the redemption period and the failure to move for the termination of the stay, Union has not demonstrated impatience regarding payment.

**17.** In *In re Dydo*, 163 B.R. 663 (Bankr.D.Conn. 1994), debtors previously granted a chapter 7 discharge wanted to keep a residence which was subject to a mortgage held by Citicorp securing a debt of more than $141,000. *Id.* at 664. The parties stipulated that the fair market value of the residence was $107,500, which the debtors planned to pay over sixty months. *Id.* The debtors relied heavily on *Johnson*. *Id.* Judge Krechevsky denied confirmation of the plan, stating that "The *Johnson* case contains no reference to § 1322(b)(2), and I find that holding inapposite in the present proceeding.... In light of the *Nobelman* ruling, I conclude that the debtors' Chapter 13 plan proposes to modify the rights of Citicorp as the holder of a first mortgage secured

only by the debtors' principal residence. Such modification is prohibited by § 1322(b)(2)." *Id.* at 664–65. The *In re Dydo* case has been cited approvingly by two other cases, *Gelletich v. Household Realty Corp. (In re Gelletich)*, 167 B.R. 370 (Bankr.E.D.Pa.1994) and *Parker v. Federal Home Loan Mortgage Corp.*, 179 B.R. 492 (E.D.La.1995).

**18.** Why the Kirchners would attempt to simulate a foreclosure sale of the residence solely for Union's benefit instead of allowing Union to foreclose is also not obvious at first glance. Such a sale would seem to be of no benefit to the Kirchners. However, it should be noted that the offer to purchase filed with the Kirchners' plan was from a buyer also named Kirchner.

**19.** While the Kirchners' counsel contends that "debtors at this time have amended their claim [plan?] orally and will pay the stipulated value of the real estate which is $43,500," this court is unaware of any procedure allowing oral amendment to a chapter 13 plan.

**20.** *See* § 1325(a)(5)(B)(ii); *In re Walters*, 203 B.R. 122 (Bankr.S.D.Ill.1996) (Meyers, J.) ("To satisfy the requirements of [§ 1325(a)(5)(B)], debtor's plan need only provide that [the secured

necessarily take some time to complete. Therefore, something more than $43,500 would have to be paid to Union to yield a present value of $43,500.

However, minor amendments cannot cure the problems with this plan. Despite the fact that the modification to Union's rights are not primarily affected by the Kirchners' plan, and despite the fact that those rights modified by the plan are economically insignificant, they nonetheless are some sort of rights. Guessing what the Supreme Court would opine, I will look to its most recent case for primary guidance and interpret *Nobelman* as proscribing even this sort of modification. But I do so with little confidence. Surely as Justice Scalia suggests, the next visit to the subject could head in yet another direction.

Confirmation must be denied. It will be so ordered.

creditor] retain its lien and that [the secured creditor] be paid interest 'over and above the allowed secured claim at whatever interest rate is equivalent to the discount rate selected by the court or agreed upon by the parties.' ") (quoting 5 Collier on Bankruptcy ¶ 1325.06[2] at 1325–49 (15th ed.1996)).