# BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION *v.* 203 NORTH LaSALLE STREET PARTNERSHIP

No. 97–1418.   Argued November 2, 1998—Decided May 3, 1999

436

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment, in which SCALIA, J., joined, *post*, p. 458. STEVENS, J., filed a dissenting opinion, *post*, p. 463.

*Roy T. Englert, Jr.,* argued the cause for petitioner. With him on the briefs were *Thomas S. Kiriakos* and *James C. Schroeder.*

*Patricia A. Millett* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Waxman, Assistant Attorney General Hunger, Deputy Solicitor General Wallace, William Kanter,* and *Bruce G. Forrest.*

*Richard M. Bendix, Jr.*, argued the cause for respondent. With him on the brief were *Malcolm M. Gaynor* and *Paul J. Gaynor.**

JUSTICE SOUTER delivered the opinion of the Court.

The issue in this Chapter 11 reorganization case is whether a debtor's prebankruptcy equity holders may, over the objection of a senior class of impaired creditors, contribute new capital and receive ownership interests in the reorganized entity, when that opportunity is given exclusively to the old equity holders under a plan adopted without consideration of alternatives. We hold that old equity holders are disqualified from participating in such a "new value" transaction by the terms of 11 U. S. C. § 1129(b)(2)(B)(ii), which in such circumstances bars a junior interest holder's receipt of any property on account of his prior interest.

## I

Petitioner, Bank of America National Trust and Savings Association (Bank),[1] is the major creditor of respondent, 203 North LaSalle Street Partnership (Debtor or Partnership),

---

*Briefs of *amici curiae* urging reversal were filed for the American Bankers Association et al. by *John J. Gill III, Michael F. Crotty*, and *Christopher E. Chenoweth;* for the American College of Real Estate Lawyers by *Robert M. Zinman* and *Christopher F. Graham;* for the American Council of Life Insurance by *James A. Pardo, Jr., David G. Epstein, Brian C. Walsh*, and *Phillip E. Stano;* and for Ronald Mann et al. by *Mr. Mann*, pro se, *Robert K. Rasmussen*, and *Alan Schwartz.*

Briefs of *amici curiae* urging affirmance were filed for the National Association of Credit Management by *Charles M. Tatelbaum* and *Elizabeth Warren;* for National Small Business United et al. by *Isaac M. Pachulski, K. John Shaffer*, and *Kenneth N. Klee;* and for Bruce A. Markell, pro se.

[1] Bank of America, Illinois, was the appellant in the case below. As a result of a merger, it is now known as Bank of America National Trust and Savings Association.

an Illinois real estate limited partnership.[2]    The Bank lent the Debtor some $93 million, secured by a nonrecourse first mortgage[3] on the Debtor's principal asset, 15 floors of an office building in downtown Chicago.   In January 1995, the Debtor defaulted, and the Bank began foreclosure in a state court.

In March, the Debtor responded with a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U. S. C. § 1101 *et seq.*, which automatically stayed the foreclosure proceedings, see § 362(a).   *In re 203 N. LaSalle Street Partnership*, 126 F. 3d 955, 958 (CA7 1997); *Bank of America, Illinois* v. *203 N. LaSalle Street Partnership*, 195 B. R. 692, 696 (ND Ill. 1996).   The Debtor's principal objective was to ensure that its partners retained title to the property so as to avoid roughly $20 million in personal tax liabilities, which would fall due if the Bank foreclosed. 126 F. 3d, at 958; 195 B. R., at 698.   The Debtor proceeded to propose a reorganization plan during the 120-day period when it alone had the right to do so, see 11 U. S. C. § 1121(b); see also § 1121(c) (exclusivity period extends to 180 days if the debtor files plan within the initial 120 days).[4]   The Bankruptcy Court rejected the Bank's motion to terminate the period of exclusivity to make way for a plan of its own to

---

[2]The limited partners in this case are considered the Debtor's equity holders under the Bankruptcy Code, see 11 U. S. C. §§ 101(16), (17), and the Debtor Partnership's actions may be understood as taken on behalf of its equity holders.

[3]A nonrecourse loan requires the Bank to look only to the Debtor's collateral for payment.   But see n. 6, *infra.*

[4]The Debtor filed an initial plan on April 13, 1995, and amended it on May 12, 1995.   The Bank objected, and the Bankruptcy Court rejected the plan on the ground that it was not feasible.   See § 1129(a)(11).   The Debtor submitted a new plan on September 11, 1995.   *In re 203 N. LaSalle*, 126 F. 3d 955, 958–959 (CA7 1997).

liquidate the property, and instead extended the exclusivity period for cause shown, under § 1121(d).[5]

The value of the mortgaged property was less than the balance due the Bank, which elected to divide its undersecured claim into secured and unsecured deficiency claims under § 506(a) and § 1111(b).[6]  126 F. 3d, at 958.   Under the plan, the Debtor separately classified the Bank's secured claim, its unsecured deficiency claim, and unsecured trade debt owed to other creditors.   See § 1122(a).[7]   The Bankruptcy Court found that the Debtor's available assets were prepetition rents in a cash account of $3.1 million and the 15 floors of rental property worth $54.5 million.   The secured claim was valued at the latter figure, leaving the Bank with an unsecured deficiency of $38.5 million.

So far as we need be concerned here, the Debtor's plan had these further features:

---

[5] The Bank neither appealed the denial nor raised it as an issue in this appeal.

[6] Having agreed to waive recourse against any property of the Debtor other than the real estate, the Bank had no unsecured claim outside of Chapter 11.   Section 1111(b), however, provides that nonrecourse secured creditors who are undersecured must be treated in Chapter 11 as if they had recourse.

[7] Indeed, the Seventh Circuit apparently requires separate classification of the deficiency claim of an undersecured creditor from other general unsecured claims. See *In re Woodbrook Associates,* 19 F. 3d 312, 319 (1994).   Nonetheless, the Bank argued that if its deficiency claim had been included in the class of general unsecured creditors, its vote against confirmation would have resulted in the plan's rejection by that class. The Bankruptcy Court and the District Court rejected the contention that the classifications were gerrymandered to obtain requisite approval by a single class, *In re 203 N. LaSalle Street Limited Partnership,* 190 B. R. 567, 592–593 (Bkrtcy. Ct. ND Ill. 1995); *Bank of America, Illinois* v. *203 N. LaSalle Street Partnership,* 195 B. R. 692, 705 (ND Ill. 1996), and the Court of Appeals agreed, 126 F. 3d, at 968.   The Bank sought no review of that issue, which is thus not before us.

(1) The Bank's $54.5 million secured claim would be paid in full between 7 and 10 years after the original 1995 repayment date.[8]

(2) The Bank's $38.5 million unsecured deficiency claim would be discharged for an estimated 16% of its present value.[9]

(3) The remaining unsecured claims of $90,000, held by the outside trade creditors, would be paid in full, without interest, on the effective date of the plan.[10]

(4) Certain former partners of the Debtor would contribute $6.125 million in new capital over the course of five years (the contribution being worth some $4.1 million in present value), in exchange for the Partnership's entire ownership of the reorganized debtor.

The last condition was an exclusive eligibility provision: the old equity holders were the only ones who could contribute new capital.[11]

The Bank objected and, being the sole member of an impaired class of creditors, thereby blocked confirmation of the

---

[8] Payment consisted of a prompt cash payment of $1,149,500 and a secured, 7-year note, extendable at the Debtor's option. 126 F. 3d, at 959, n. 4; 195 B. R., at 698.

[9] This expected yield was based upon the Bankruptcy Court's projection that a sale or refinancing of the property on the 10th anniversary of the plan confirmation would produce a $19-million distribution to the Bank.

[10] The Debtor originally owed $160,000 in unsecured trade debt. After filing for bankruptcy, the general partners purchased some of the trade claims. Upon confirmation, the insiders would waive all general unsecured claims they held. 126 F. 3d, at 958, n. 2; 195 B. R., at 698.

[11] The plan eliminated the interests of noncontributing partners. More than 60% of the Partnership interests would change hands on confirmation of the plan. See Brief for Respondent 4, n. 7. The new Partnership, however, would consist solely of former partners, a feature critical to the preservation of the Partnership's tax shelter. Tr. of Oral Arg. 32.

plan on a consensual basis. See § 1129(a)(8).[12] The Debtor, however, took the alternate route to confirmation of a reorganization plan, forthrightly known as the judicial "cramdown" process for imposing a plan on a dissenting class. § 1129(b). See generally Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L. J. 133 (1979).

There are two conditions for a cramdown. First, all requirements of § 1129(a) must be met (save for the plan's acceptance by each impaired class of claims or interests, see § 1129(a)(8)). Critical among them are the conditions that the plan be accepted by at least one class of impaired creditors, see § 1129(a)(10), and satisfy the "best-interest-of-creditors" test, see § 1129(a)(7).[13] Here, the class of trade creditors with impaired unsecured claims voted for the plan,[14] 126 F. 3d, at 959, and there was no issue of best interest. Second, the objection of an impaired creditor class may be overridden only if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1). As to a dissenting class of impaired unsecured creditors, such a plan may be found to be "fair and equitable" only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative,

---

[12] A class of creditors accepts if a majority of the creditors and those holding two-thirds of the total dollar amount of the claims within that class vote to approve the plan. § 1126(c).

[13] Section 1129(a)(7) provides that if the holder of a claim impaired under a plan of reorganization has not accepted the plan, then such holder must "receive . . . on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive . . . if the debtor were liquidated under chapter 7 . . . on such date." The "best interests" test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.

[14] Claims are unimpaired if they retain all of their prepetition legal, equitable, and contractual rights against the debtor. § 1124.

if "the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property," § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the "absolute priority rule."

The absolute priority rule was the basis for the Bank's position that the plan could not be confirmed as a cramdown. As the Bank read the rule, the plan was open to objection simply because certain old equity holders in the Debtor Partnership would receive property even though the Bank's unsecured deficiency claim would not be paid in full. The Bankruptcy Court approved the plan nonetheless, and accordingly denied the Bank's pending motion to convert the case to Chapter 7 liquidation, or to dismiss the case. The District Court affirmed, 195 B. R. 692 (ND Ill. 1996), as did the Court of Appeals.

The majority of the Seventh Circuit's divided panel found ambiguity in the language of the statutory absolute priority rule, and looked beyond the text to interpret the phrase "on account of" as permitting recognition of a "new value corollary" to the rule. 126 F. 3d, at 964–965. According to the panel, the corollary, as stated by this Court in *Case* v. *Los Angeles Lumber Products Co.*, 308 U. S. 106, 118 (1939), provides that the objection of an impaired senior class does not bar junior claim holders from receiving or retaining property interests in the debtor after reorganization, if they contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for successful reorganization of the restructured enterprise. The panel majority held that

> "when an old equity holder retains an equity interest in the reorganized debtor by meeting the requirements of the new value corollary, he is not receiving or retaining that interest 'on account of' his prior equitable owner-

ship of the debtor. Rather, he is allowed to participate in the reorganized entity 'on account of' a new, substantial, necessary and fair infusion of capital." 126 F. 3d, at 964.

In the dissent's contrary view, there is nothing ambiguous about the text: the "plain language of the absolute priority rule . . . does not include a new value exception." *Id.*, at 970 (opinion of Kanne, J.). Since "[t]he Plan in this case gives [the Debtor's] partners the exclusive right to retain their ownership interest in the indebted property *because of* their status as . . . prior interest holder[s]," *id.*, at 973, the dissent would have reversed confirmation of the plan.

We granted certiorari, 523 U. S. 1106 (1998), to resolve a Circuit split on the issue. The Seventh Circuit in this case joined the Ninth in relying on a new value corollary to the absolute priority rule to support confirmation of such plans. See *In re Bonner Mall Partnership*, 2 F. 3d 899, 910–916 (CA9 1993), cert. granted, 510 U. S. 1039, vacatur denied and appeal dism'd as moot, 513 U. S. 18 (1994). The Second and Fourth Circuits, by contrast, without explicitly rejecting the corollary, have disapproved plans similar to this one. See *In re Coltex Loop Central Three Partners, L. P.*, 138 F. 3d 39, 44–45 (CA2 1998); *In re Bryson Properties, XVIII*, 961 F. 2d 496, 504 (CA4), cert. denied, 506 U. S. 866 (1992).[15] We do not decide whether the statute includes a new value corollary or exception, but hold that on any reading respondent's proposed plan fails to satisfy the statute, and accordingly reverse.

---

[15] All four of these cases arose in the single-asset real estate context, the typical one in which new value plans are proposed. See 7 Collier on Bankruptcy ¶ 1129.04[4][c][ii][B], p. 1129–113 (rev. 15th ed. 1998). See also Strub, Competition, Bargaining, and Exclusivity under the New Value Rule: Applying the Single-Asset Paradigm of *Bonner Mall*, 111 Banking L. J. 228, 231 (1994) ("Most of the cases discussing the new value issue have done so in connection with an attempt by a single-asset debtor to reorganize under chapter 11").

## II

The terms "absolute priority rule" and "new value corollary" (or "exception") are creatures of law antedating the current Bankruptcy Code, and to understand both those terms and the related but inexact language of the Code some history is helpful. The Bankruptcy Act preceding the Code contained no such provision as subsection (b)(2)(B)(ii), its subject having been addressed by two interpretive rules. The first was a specific gloss on the requirement of § 77B (and its successor, Chapter X) of the old Act, that any reorganization plan be "fair and equitable." 11 U. S. C. § 205(e) (1934 ed., Supp. I) (repealed 1938) (§ 77B); 11 U. S. C. § 621(2) (1934 ed., Supp. IV) (repealed 1979) (Chapter X). The reason for such a limitation was the danger inherent in any reorganization plan proposed by a debtor, then and now, that the plan will simply turn out to be too good a deal for the debtor's owners. See H. R. Doc. No. 93–137, pt. I, p. 255 (1973) (discussing concern with "the ability of a few insiders, whether representatives of management or major creditors, to use the reorganization process to gain an unfair advantage"); *ibid.* ("[I]t was believed that creditors, because of management's position of dominance, were not able to bargain effectively without a clear standard of fairness and judicial control"); Ayer, Rethinking Absolute Priority After *Ahlers,* 87 Mich. L. Rev. 963, 969–973 (1989). Hence the pre-Code judicial response known as the absolute priority rule, that fairness and equity required that "the creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever." *Northern Pacific R. Co.* v. *Boyd,* 228 U. S. 482, 508 (1913). See also *Louisville Trust Co.* v. *Louisville, N. A. & C. R. Co.,* 174 U. S. 674, 684 (1899) (reciting "the familiar rule that the stockholder's interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors," and concluding that "any arrangement of the parties by which the subordi-

nate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation").

The second interpretive rule addressed the first. Its classic formulation occurred in *Case* v. *Los Angeles Lumber Products Co.*, in which the Court spoke through Justice Douglas in this dictum:

> "It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. . . . Where th[e] necessity [for new capital] exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made. . . .
>
> "[W]e believe that to accord 'the creditor his full right of priority against the corporate assets' where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder." 308 U. S., at 121–122.

Although counsel for one of the parties here has described the *Case* observation as " 'black-letter' principle," Brief for Respondent 38, it never rose above the technical level of dictum in any opinion of this Court, which last addressed it in *Norwest Bank Worthington* v. *Ahlers*, 485 U. S. 197 (1988), holding that a contribution of " 'labor, experience, and expertise' " by a junior interest holder was not in the " 'money's worth' " that the *Case* observation required. 485 U. S., at 203–205. See also *Marine Harbor Properties, Inc.* v. *Manufacturers Trust Co.*, 317 U. S. 78, 85 (1942); *Consolidated Rock Products Co.* v. *Du Bois*, 312 U. S. 510, 529, n. 27 (1941). Nor, prior to the enactment of the current Bankruptcy Code,

did any court rely on the *Case* dictum to approve a plan that gave old equity a property right after reorganization. See Ayer, *supra,* at 1016; Markell, Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations, 44 Stan. L. Rev. 69, 92 (1991). Hence the controversy over how weighty the *Case* dictum had become, as reflected in the alternative labels for the new value notion: some writers and courts (including this one, see *Ahlers, supra,* at 203–204, n. 3) have spoken of it as an exception to the absolute priority rule, see, *e. g., In re Potter Material Service, Inc.,* 781 F. 2d 99, 101 (CA7 1986); Miller, Bankruptcy's New Value Exception: No Longer a Necessity, 77 B. U. L. Rev. 975 (1997); Georgakopoulos, New Value, Fresh Start, 3 Stan. J. L. Bus. & Fin. 125 (1997), while others have characterized it as a simple corollary to the rule, see, *e. g., In re Bonner Mall Partnership,* 2 F. 3d, at 906; Ayer, *supra,* at 999.

Enactment of the Bankruptcy Code in place of the prior Act might have resolved the status of new value by a provision bearing its name or at least unmistakably couched in its terms, but the Congress chose not to avail itself of that opportunity. In 1973, Congress had considered proposals by the Bankruptcy Commission that included a recommendation to make the absolute priority rule more supple by allowing nonmonetary new value contributions. H. R. Doc. No. 93–137, pt. I, at 258–259; *id.,* pt. II, at 242, 252. Although Congress took no action on any of the ensuing bills containing language that would have enacted such an expanded new value concept,[16] each of them was reintroduced in the next congressional session. See H. R. 31, 94th Cong., 1st Sess.,

---

[16] See H. R. 10792, 93d Cong., 1st Sess., §§ 7–303(4), 7–310(d)(2)(B) (1973); H. R. 16643, 93d Cong., 2d Sess., §§ 7–301(4), 7–308(d)(2)(B) (1974); S. 2565, 93d Cong., 1st Sess., §§ 7–303(4), 7–310(d)(2)(B) (1973); S. 4046, 93d Cong., 2d Sess., §§ 7–301(4), 7–308(d)(2)(B) (1974).

§§ 7–303(4),[17] 7–310(d)(2)(B) (1975);[18] H. R. 32, 94th Cong., 1st Sess., §§ 7–301(4), 7–308(d)(2)(B) (1975); S. 235, 94th Cong., 1st Sess., §§ 7–301(4), 7–308(d)(2)(B) (1975); S. 236, 94th Cong., 1st Sess., §§ 7–303(4), 7–310(d)(2)(B) (1975). After extensive hearings, a substantially revised House bill emerged, but without any provision for nonmonetary new value contributions. See H. R. 6, 95th Cong., 1st Sess., §§ 1123, 1129(b) (1977).[19] After a lengthy markup session, the House produced H. R. 8200, 95th Cong., 1st Sess. (1977), which would eventually become the law, H. R. Rep. No. 95–595, p. 3 (1977). It had no explicit new value language, expansive or otherwise, but did codify the absolute priority rule in nearly its present form. See H. R. 8200, *supra*, § 1129(b)(2)(B)(iv) ("[T]he holders of claims or interests of any class of claims or interests, as the case may be, that is junior to such class will not receive or retain under

---

[17] Section 7–303(4) read: "[W]hen the equity security holders retain an interest under the plan, the individual debtor, certain partners or equity security holders will make a contribution which is important to the operation of the reorganized debtor or the successor under the plan, for participation by the individual debtor, such partners, or such holders under the plan on a basis which reasonably approximates the value, if any, of their interests, and the additional estimated value of such contribution."

[18] Section 7–310(d)(2)(B) read: "Subject to the provisions of section 7–303 (3) and (4) and the court's making any findings required thereby, there is a reasonable basis for the valuation on which the plan is based and the plan is fair and equitable in that there is a reasonable probability that the securities issued and other consideration distributed under the plan will fully compensate the respective classes of creditors and equity security holders of the debtor for their respective interests in the debtor or his property."

[19] Section 1129(b) of H. R. 6 read, in relevant part: "[T]he court, on request of the proponent of such plan, shall confirm such plan . . . if such plan is fair and equitable with respect to all classes except any class that has accepted the plan and that is comprised of claims or interests on account of which the holders of such claims or interests will receive or retain under the plan not more than would be so received or retained under a plan that is fair and equitable with respect to all classes."

the plan on account of such junior claims or interests any property").[20]

For the purpose of plumbing the meaning of subsection (b)(2)(B)(ii) in search of a possible statutory new value exception, the lesson of this drafting history is equivocal. Although hornbook law has it that "'Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded,'" *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 442–443 (1987), the phrase "on account of" is not *silentium*, and the language passed by in this instance had never been in the bill finally enacted, but only in predecessors that died on the vine. None of these contained an explicit codification of the absolute priority rule,[21] and even in these earlier bills the language in question stated an expansive new value concept, not the rule as limited in the *Case* dictum.[22]

The equivocal note of this drafting history is amplified by another feature of the legislative advance toward the current law. Any argument from drafting history has to account for the fact that the Code does not codify any authoritative pre-Code version of the absolute priority rule. Compare § 1129(b)(2)(B)(ii) ("[T]he holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property") with *Boyd*, 228 U. S., at 508 ("[T]he creditors were entitled to be paid before the stockholders could retain [a right of property] for any purpose whatever"), and *Case*, 308 U. S., at 116 ("'[C]reditors are entitled to priority over stockholders against all the property of an insolvent corporation'" (quoting *Kansas City Terminal R. Co.* v. *Central Union*

---

[20] While the earlier proposed bills contained provisions requiring as a condition of confirmation that a plan be "fair and equitable," none of them contained language explicitly codifying the absolute priority rule. See, e. g., nn. 17–19, *supra*.

[21] See n. 20, *supra*.

[22] See nn. 17–18, *supra*.

*Trust Co. of N. Y.*, 271 U. S. 445, 455 (1926))). See H. R. Rep. No. 95–595, at 414 (characterizing § 1129(b)(2)(B)(ii) as a "partial codification of the absolute priority rule"); *ibid.* ("The elements of the [fair and equitable] test are new[,] departing from both the absolute priority rule and the best interests of creditors tests found under the Bankruptcy Act").

The upshot is that this history does nothing to disparage the possibility apparent in the statutory text, that the absolute priority rule now on the books as subsection (b)(2)(B)(ii) may carry a new value corollary. Although there is no literal reference to "new value" in the phrase "on account of such junior claim," the phrase could arguably carry such an implication in modifying the prohibition against receipt by junior claimants of any interest under a plan while a senior class of unconsenting creditors goes less than fully paid.

### III

Three basic interpretations have been suggested for the "on account of" modifier. The first reading is proposed by the Partnership, that "on account of" harks back to accounting practice and means something like "in exchange for," or "in satisfaction of," Brief for Respondent 12–13, 15, n. 16. On this view, a plan would not violate the absolute priority rule unless the old equity holders received or retained property in exchange for the prior interest, without any significant new contribution; if substantial money passed from them as part of the deal, the prohibition of subsection (b)(2)(B)(ii) would not stand in the way, and whatever issues of fairness and equity there might otherwise be would not implicate the "on account of" modifier.

This position is beset with troubles, the first one being textual. Subsection (b)(2)(B)(ii) forbids not only receipt of property on account of the prior interest but its retention as well. See also §§ 1129(a)(7)(A)(ii), (a)(7)(B), (b)(2)(B)(i), (b)(2)(C)(i), (b)(2)(C)(ii). A common instance of the latter

would be a debtor's retention of an interest in the insolvent business reorganized under the plan. Yet it would be exceedingly odd to speak of "retain[ing]" property in exchange for the same property interest, and the eccentricity of such a reading is underscored by the fact that elsewhere in the Code the drafters chose to use the very phrase "in exchange for," § 1123(a)(5)(J) (a plan shall provide adequate means for implementation, including "issuance of securities of the debtor . . . for cash, for property, for existing securities, or in exchange for claims or interests"). It is unlikely that the drafters of legislation so long and minutely contemplated as the 1978 Bankruptcy Code would have used two distinctly different forms of words for the same purpose. See *Russello* v. *United States*, 464 U. S. 16, 23 (1983).

The second difficulty is practical: the unlikelihood that Congress meant to impose a condition as manipulable as subsection (b)(2)(B)(ii) would be if "on account of" meant to prohibit merely an exchange unaccompanied by a substantial infusion of new funds but permit one whenever substantial funds changed hands. "Substantial" or "significant" or "considerable" or like characterizations of a monetary contribution would measure it by the Lord Chancellor's foot, and an absolute priority rule so variable would not be much of an absolute. Of course it is true (as already noted) that, even if old equity holders could displace the rule by adding some significant amount of cash to the deal, it would not follow that their plan would be entitled to adoption; a contested plan would still need to satisfy the overriding condition of fairness and equity. But that general fairness and equity criterion would apply in any event, and one comes back to the question why Congress would have bothered to add a separate priority rule without a sharper edge.

Since the "in exchange for" reading merits rejection, the way is open to recognize the more common understanding of "on account of" to mean "because of." This is certainly the usage meant for the phrase at other places in the stat-

ute, see § 1111(b)(1)(A) (treating certain claims as if the holder of the claim "had recourse against the debtor on account of such claim"); § 522(d)(10)(E) (permitting debtors to exempt payments under certain benefit plans and contracts "on account of illness, disability, death, age, or length of service"); § 547(b)(2) (authorizing trustee to avoid a transfer of an interest of the debtor in property "for or on account of an antecedent debt owed by the debtor"); § 547(c)(4)(B) (barring trustee from avoiding a transfer when a creditor gives new value to the debtor "on account of which new value the debtor did not make an otherwise unavoidable transfer to . . . such creditor"). So, under the commonsense rule that a given phrase is meant to carry a given concept in a single statute, see *Cohen* v. *de la Cruz*, 523 U. S. 213, 219–220 (1998), the better reading of subsection (b)(2)(B)(ii) recognizes that a causal relationship between holding the prior claim or interest and receiving or retaining property is what activates the absolute priority rule.

The degree of causation is the final bone of contention. We understand the Government, as *amicus curiae*, to take the starchy position not only that any degree of causation between earlier interests and retained property will activate the bar to a plan providing for later property, Brief for United States as *Amicus Curiae* 11–15, but also that whenever the holders of equity in the Debtor end up with some property there will be some causation; when old equity, and not someone on the street, gets property the reason is *res ipsa loquitur.* An old equity holder simply cannot take property under a plan if creditors are not paid in full. *Id.,* at 10–11, 18. See also Tr. of Oral Arg. 28.[23]

---

[23] Our interpretation of the Government's position in this respect is informed by its view as *amicus curiae* in the *Bonner Mall* case: "the language and structure of the Code prohibit in all circumstances confirmation of a plan that grants the prior owners an equity interest in the reorganized debtor over the objection of a class of unpaid unsecured claims." Brief for United States as *Amicus Curiae* in *United States*

There are, however, reasons counting against such a reading. If, as is likely, the drafters were treating junior claimants or interest holders as a class at this point (see *Ahlers*, 485 U. S., at 202),[24] then the simple way to have prohibited the old interest holders from receiving anything over objection would have been to omit the "on account of" phrase entirely from subsection (b)(2)(B)(ii). On this assumption, reading the provision as a blanket prohibition would leave "on account of" as a redundancy, contrary to the interpretive obligation to try to give meaning to all the statutory language. See, *e. g., Moskal* v. *United States*, 498 U. S. 103, 109–110 (1990); *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955).[25] One would also have to ask why Congress

---

*Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, O. T. 1993, No. 93–714, p. 14.

The Government conceded that, in the case before us, it had no need to press this more stringent view, since "whatever [the] definition of 'on account of,' a 100 percent certainty that junior equit[y] obtains property because they're junior equity will satisfy that." See Tr. of Oral Arg. 29 (internal quotation marks added).

[24] It is possible, on the contrary, to argue on the basis of the immediate text that the prohibition against receipt of an interest "on account of" a prior unsecured claim or interest was meant to indicate only that there is no *per se* bar to such receipt by a creditor holding both a senior secured claim and a junior unsecured one, when the senior secured claim accounts for the subsequent interest. This reading would of course eliminate the phrase "on account of" as an express source of a new value exception, but would leave open the possibility of interpreting the absolute priority rule itself as stopping short of prohibiting a new value transaction.

[25] Given our obligation to give meaning to the "on account of" modifier, we likewise do not rely on various statements in the House Report or by the bill's floor leaders, which, when read out of context, imply that Congress intended an emphatic, unconditional absolute priority rule. See, *e. g.*, H. R. Rep. No. 95–595, p. 224 (1977) ("[T]he bill requires that the plan pay any dissenting class in full before any class junior to the dissenter may be paid at all"); *id.*, at 413 ("[I]f [an impaired class is] paid less than in full, then no class junior may receive anything under the plan"); 124 Cong. Rec. 32408 (1978) (statement of Rep. Edwards) (cramdown plan con-

would have desired to exclude prior equity categorically from the class of potential owners following a cramdown. Although we have some doubt about the Court of Appeals's assumption (see 126 F. 3d, at 966, and n. 12) that prior equity is often the only source of significant capital for reorganizations, see, *e. g.*, Blum & Kaplan, The Absolute Priority Doctrine in Corporate Reorganizations, 41 U. Chi. L. Rev. 651, 672 (1974); Mann, Strategy and Force in the Liquidation of Secured Debt, 96 Mich. L. Rev. 159, 182–183, 192–194, 208–209 (1997), old equity may well be in the best position to make a go of the reorganized enterprise and so may be the party most likely to work out an equity-for-value reorganization.

A less absolute statutory prohibition would follow from reading the "on account of" language as intended to reconcile the two recognized policies underlying Chapter 11, of preserving going concerns and maximizing property available to satisfy creditors, see *Toibb* v. *Radloff,* 501 U. S. 157, 163 (1991). Causation between the old equity's holdings and subsequent property substantial enough to disqualify a plan would presumably occur on this view of things whenever old equity's later property would come at a price that failed to provide the greatest possible addition to the bankruptcy estate, and it would always come at a price too low when the equity holders obtained or preserved an ownership interest for less than someone else would have paid.[26]  A truly full

---

firmable only "as long as no class junior to the dissenting class receives anything at all"); *id.,* at 34007 (statement of Sen. DeConcini) (same).

[26] Even when old equity would pay its top dollar and that figure was as high as anyone else would pay, the price might still be too low unless the old equity holders paid more than anyone else would pay, on the theory that the "necessity" required to justify old equity's participation in a new value plan is a necessity for the participation of old equity as such. On this interpretation, disproof of a bargain would not satisfy old equity's burden; it would need to show that no one else would pay as much.  See,

value transaction, on the other hand, would pose no threat to the bankruptcy estate not posed by any reorganization, provided of course that the contribution be in cash or be realizable money's worth, just as *Ahlers* required for application of *Case*'s new value rule.   Cf. *Ahlers, supra,* at 203–205; *Case,* 308 U. S., at 121.

## IV

Which of these positions is ultimately entitled to prevail is not to be decided here, however, for even on the latter view the Bank's objection would require rejection of the plan at issue in this case.   It is doomed, we can say without necessarily exhausting its flaws, by its provision for vesting equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan.   Although the Debtor's exclusive opportunity to propose a plan under § 1121(b) is not itself "property" within the meaning of subsection (b)(2)(B)(ii), the respondent partnership in this case has taken advantage of this opportunity by proposing a plan under which the benefit of equity ownership may be obtained by no one but old equity partners. Upon the court's approval of that plan, the partners were in the same position that they would have enjoyed had they exercised an exclusive option under the plan to buy the equity in the reorganized entity, or contracted to purchase it from a seller who had first agreed to deal with no one else. It is quite true that the escrow of the partners' proposed investment eliminated any formal need to set out an express

---

*e. g., In. re Coltex Loop Central Three Partners, L. P.,* 138 F. 3d 39, 45 (CA2 1998) ("[O]ld equity must be willing to contribute more money than any other source" (internal quotation marks and citation omitted)); Strub, 111 Banking L. J., at 243 (old equity must show that the reorganized entity "needs funds *from the prior owner-managers* because no other source of capital is available").   No such issue is before us, and we emphasize that our holding here does not suggest an exhaustive list of the requirements of a proposed new value plan.

option or exclusive dealing provision in the plan itself, since the court's approval that created the opportunity and the partners' action to obtain its advantage were simultaneous. But before the Debtor's plan was accepted no one else could propose an alternative one, and after its acceptance no one else could obtain equity in the reorganized entity. At the moment of the plan's approval the Debtor's partners necessarily enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusively entitled offeror or option holder. This opportunity should, first of all, be treated as an item of property in its own right. Cf. *In re Coltex Loop Central Three Partners, L. P.,* 138 F. 3d, at 43 (exclusive right to purchase postpetition equity is itself property); *In re Bryson Properties, XVIII,* 961 F. 2d, at 504; *Kham & Nate's Shoes No. 2, Inc.* v. *First Bank,* 908 F. 2d 1351, 1360 (CA7 1990); D. Baird, The Elements of Bankruptcy 261 (rev. ed. 1993) ("The right to get an equity interest for its fair market value is 'property' as the word is ordinarily used. Options to acquire an interest in a firm, even at its market value, trade for a positive price"). While it may be argued that the opportunity has no market value, being significant only to old equity holders owing to their potential tax liability, such an argument avails the Debtor nothing, for several reasons. It is to avoid just such arguments that the law is settled that any otherwise cognizable property interest must be treated as sufficiently valuable to be recognized under the Bankruptcy Code. See *Ahlers,* 485 U. S., at 207–208. Even aside from that rule, the assumption that no one but the Debtor's partners might pay for such an opportunity would obviously support no inference that it is valueless, let alone that it should not be treated as property. And, finally, the source in the tax law of the opportunity's value to the partners implies in no way that it lacks value to others. It might, indeed, be valuable to another precisely as a way to keep the Debtor from implementing a plan that would avoid a Chapter 7 liquidation.

Given that the opportunity is property of some value, the question arises why old equity alone should obtain it, not to mention at no cost whatever. The closest thing to an answer favorable to the Debtor is that the old equity partners would be given the opportunity in the expectation that in taking advantage of it they would add the stated purchase price to the estate. See Brief for Respondent 40–41. But this just begs the question why the opportunity should be exclusive to the old equity holders. If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain. There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor. And that, of course, is to say that old equity would obtain its opportunity, and the resulting benefit, because of old equity's prior interest within the meaning of subsection (b)(2)(B)(ii). Hence it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended "on account of" the old equity position and therefore subject to an unpaid senior creditor class's objection.

It is no answer to this to say that the exclusive opportunity should be treated merely as a detail of the broader transaction that would follow its exercise, and that in this wider perspective no favoritism may be inferred, since the old equity partners would pay something, whereas no one else would pay anything. If this argument were to carry the day, of course, old equity could obtain a new property interest for a dime without being seen to receive anything on account of its old position. But even if we assume that old equity's plan would not be confirmed without satisfying the judge that the purchase price was top dollar, there is a further reason here not to treat property consisting of an exclusive opportunity as subsumed within the total trans-

action proposed. On the interpretation assumed here, it would, of course, be a fatal flaw if old equity acquired or retained the property interest without paying full value. It would thus be necessary for old equity to demonstrate its payment of top dollar, but this it could not satisfactorily do when it would receive or retain its property under a plan giving it exclusive rights and in the absence of a competing plan of any sort.[27] Under a plan granting an exclusive right, making no provision for competing bids or competing plans, any determination that the price was top dollar would necessarily be made by a judge in bankruptcy court, whereas the best way to determine value is exposure to a market. See Baird, Elements of Bankruptcy, at 262; Bowers, Rehabilitation, Redistribution or Dissipation: The Evidence for Choosing Among Bankruptcy Hypotheses, 72 Wash. U. L. Q. 955, 959, 963, n. 34, 975 (1994); Markell, 44 Stan. L. Rev., at 73 ("Reorganization practice illustrates that the presence of competing bidders for a debtor, whether they are owners or not, tends to increase creditor dividends"). This is a point of some significance, since it was, after all, one of the Code's innovations to narrow the occasions for courts to make valuation judgments, as shown by its preference for the supramajoritarian class creditor voting scheme in § 1126(c), see *Ahlers, supra,* at 207 ("[T]he Code provides that it is up to the creditors—and not the courts—to accept or reject a reorganization plan which fails to provide them adequate protection or fails to honor the absolute priority rule").[28] In the interest of statutory coherence, a like dis-

---

[27] The dissent emphasizes the care taken by the Bankruptcy Judge in examining the valuation evidence here, in arguing that there is no occasion for us to consider the relationship between valuation process and top-dollar requirement. *Post,* at 467, n. 7. While we agree with the dissent as to the judge's conscientious handling of the matter, the ensuing text of this opinion sets out our reasons for thinking the Act calls for testing valuation by a required process that was not followed here.

[28] In *Ahlers,* we explained: "The Court of Appeals may well have believed that petitioners or other unsecured creditors would be better off if respondents' reorganization plan was confirmed. But that determi-

favor for decisions untested by competitive choice ought to extend to valuations in administering subsection (b)(2)(B)(ii) when some form of market valuation may be available to test the adequacy of an old equity holder's proposed contribution.

Whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity is a question we do not decide here. It is enough to say, assuming a new value corollary, that plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).

The judgment of the Court of Appeals, accordingly, is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in the judgment.

I agree with the majority's conclusion that the reorganization plan in this case could not be confirmed. However, I do

---

nation is for the creditors to make in the manner specified by the Code. 11 U. S. C. § 1126(c). Here, the principal creditors entitled to vote in the class of unsecured creditors (*i. e.*, petitioners) objected to the proposed reorganization. This was their prerogative under the Code, and courts applying the Code must effectuate their decision." 485 U. S., at 207. The voting rules of Chapter 11 represent a stark departure from the requirements under the old Act. "Congress adopted the view that creditors and equity security holders are very often better judges of the debtor's economic viability and their own economic self-interest than courts, trustees, or the SEC. . . . Consistent with this new approach, the Chapter 11 process relies on creditors and equity holders to engage in negotiations toward resolution of their interests." Brunstad, Sigal, & Schorling, Review of the Proposals of the National Bankruptcy Review Commission Pertaining to Business Bankruptcies: Part One, 53 Bus. Law. 1381, 1406, n. 136 (1998).

not see the need for its unnecessary speculations on certain issues and do not share its approach to interpretation of the Bankruptcy Code. I therefore concur only in the judgment.

## I

Our precedents make clear that an analysis of any statute, including the Bankruptcy Code, must not begin with external sources, but with the text itself. See, e. g., *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992); *Union Bank* v. *Wolas*, 502 U. S. 151, 154 (1991). The relevant Code provision in this case, 11 U. S. C. § 1129(b), does not expressly authorize prepetition equity holders to receive or retain property in a reorganized entity in exchange for an infusion of new capital.[1]  Instead, it is cast in general terms and requires that, to be confirmed over the objections of an impaired class of creditors, a reorganization plan be "fair and equitable." § 1129(b)(1). With respect to an impaired class of unsecured creditors, a plan can be fair and equitable only if, at a minimum, it "provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim," § 1129(b)(2)(B)(i), or if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property," § 1129(b)(2)(B)(ii).

Neither condition is met here. The bank did not receive property under the reorganization plan equal to the amount of its unsecured deficiency claim. See *ante*, at 439–440. Therefore, the plan could not satisfy the first condition. With respect to the second condition, the prepetition equity holders

---

[1] In this respect, § 1129 differs from other provisions of the Code, which permit owners to retain property before senior creditors are paid. See, e. g., 11 U. S. C. § 1225(b)(1)(B) (allowing a debtor to retain nondisposable income); § 1325(b)(1)(B) (same).

received at least two forms of property under the plan: the exclusive opportunity to obtain equity, *ante*, at 454–458, and an equity interest in the reorganized entity. The plan could not be confirmed if the prepetition equity holders received any of this property "on account of" their junior interest.

The meaning of the phrase "on account of" is the central interpretive question presented by this case. This phrase obviously denotes some type of causal relationship between the junior interest and the property received or retained— such an interpretation comports with common understandings of the phrase. See, *e. g.*, Random House Dictionary of the English Language 13 (2d ed. 1987) ("by reason of," "because of"); Webster's Third New International Dictionary 13 (1976) ("for the sake of," "by reason of," "because of"). It also tracks the use of the phrase elsewhere in the Code. See, *e. g.*, 11 U. S. C. §§ 365(f)(3), 510(b), 1111(b)(1)(A); see generally § 1129. Regardless of how direct the causal nexus must be, the prepetition equity holders here undoubtedly received at least one form of property—the exclusive opportunity—"on account of" their prepetition equity interest. *Ante*, at 454. Since § 1129(b)(2)(B)(ii) prohibits the prepetition equity holders from receiving "any" property under the plan on account of their junior interest, this plan was not "fair and equitable" and could not be confirmed. That conclusion, as the majority recognizes, *ibid.*, is sufficient to resolve this case. Thus, its comments on the Government's position taken in another case, *ante*, at 451–454, and its speculations about the desirability of a "market test," *ante,* at 457–458, are dicta binding neither this Court nor the lower federal courts.

## II

The majority also underestimates the need for a clear method for interpreting the Bankruptcy Code. It extensively surveys pre-Code practice and legislative history, *ante*, at 444–449, but fails to explain the relevance of these sources to the interpretive question apart from the conclu-

sory assertion that the Code's language is "inexact" and the history is "helpful," *ante*, at 444. This sort of approach to interpretation of the Bankruptcy Code repeats a methodological error committed by this Court in *Dewsnup* v. *Timm*, 502 U. S. 410 (1992).

In *Dewsnup*, the Court held, based on pre-Code practice, that § 506(d) of the Code prevented a Chapter 7 debtor from stripping down a creditor's lien on real property to the judicially determined value of the collateral. *Id.*, at 419–420. The Court justified its reliance on such practice by finding the provision ambiguous. *Id.*, at 416. Section 506 was ambiguous, in the Court's view, simply because the litigants and *amici* had offered competing interpretations of the statute. *Ibid.* This is a remarkable and untenable methodology for interpreting any statute. If litigants' differing positions demonstrate statutory ambiguity, it is hard to imagine how any provision of the Code—or any other statute—would escape *Dewsnup*'s broad sweep. A mere disagreement among litigants over the meaning of a statute does not prove ambiguity; it usually means that one of the litigants is simply wrong. *Dewsnup*'s approach to statutory interpretation enables litigants to undermine the Code by creating "ambiguous" statutory language and then cramming into the Code any good idea that can be garnered from pre-Code practice or legislative history.

The risks of relying on such practice in interpreting the Bankruptcy Code, which seeks to bring an entire area of law under a single, coherent statutory umbrella, are especially weighty. As we previously have recognized, the Code "was intended to modernize the bankruptcy laws, and as a result made significant changes in both the substantive and procedural laws of bankruptcy." *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 240 (1989) (citation omitted). The Code's overall scheme often reflects substantial departures from various pre-Code practices. Most relevant to this case, the Code created a system of creditor class ap-

proval of reorganization plans, unlike early pre-Code practice where plan confirmation depended on unanimous creditor approval and could be hijacked by a single holdout. See D. Baird, The Elements of Bankruptcy 262 (rev. ed. 1993). Hence it makes little sense to graft onto the Code concepts that were developed during a quite different era of bankruptcy practice.

Even assuming the relevance of pre-Code practice in those rare instances when the Code is truly ambiguous, see, *e. g., Midlantic Nat. Bank* v. *New Jersey Dept. of Environmental Protection,* 474 U. S. 494, 501 (1986), and assuming that the language here is ambiguous, surely the sparse history behind the new value exception cannot inform the interpretation of § 1129(b)(2)(B)(ii). No holding of this Court ever embraced the new value exception. As noted by the majority, *ante,* at 445, the leading decision suggesting this possibility, *Case* v. *Los Angeles Lumber Products Co.,* 308 U. S. 106 (1939), did so in dictum. And, prior to the Code's enactment, no court ever relied on the *Case* dictum to approve a plan. Given its questionable pedigree prior to the Code's enactment, a concept developed in dictum and employed by lower federal courts only *after* the Code's enactment is simply not relevant to interpreting this provision of the Code.[2]

This danger inherent in excessive reliance on pre-Code practice did not escape the notice of the dissenting Justices in *Dewsnup* who expressed "the greatest sympathy for the Courts of Appeals who must predict which manner of statu-

---

[2] Nor do I think that the history of rejected legislative proposals bears on the proper interpretation of the phrase "on account of." As an initial matter, such history is irrelevant for the simple reason that Congress enacted the Code, not the legislative history predating it. See *United States* v. *Estate of Romani,* 523 U. S. 517, 535–537 (1998) (SCALIA, J., concurring in part and concurring in judgment). Even if this history had some relevance, it would not support the view that Congress intended to insert a new value exception into the phrase "on account of." On the contrary, Congress never acted on bills that would have allowed nonmonetary new value contributions. *Ante,* at 446–447.

tory construction we shall use for the next Bankruptcy Code case." *Dewsnup, supra,* at 435 (SCALIA, J., joined by SOUTER, J., dissenting). Regrettably, subsequent decisions in the lower courts have borne out the dissenters' fears. The methodological confusion created by *Dewsnup* has enshrouded both the Courts of Appeals and, even more tellingly, Bankruptcy Courts, which must interpret the Code on a daily basis.[3] In the wake of *Dewsnup,* the Fifth Circuit withdrew its decision on the new value exception, prompting the author of the original opinion to observe that *Dewsnup* had clouded "[h]ow one should approach issues of a statutory construction arising from the Bankruptcy Code." *In re Greystone III Joint Venture,* 995 F. 2d 1274, 1285 (CA5 1991) (Jones, J., dissenting). Unfortunately, the approach taken today only thickens the fog.

JUSTICE STEVENS, dissenting.

Prior to the enactment of the Bankruptcy Reform Act of 1978, this Court unequivocally stated that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor if their participation is based on a contribution in money, or in money's worth, reasonably equivalent in view of all the circumstances

---

[3] See, *e. g., In re Southeast Banking Corp.,* 156 F. 3d 1114, 1123, n. 16 (CA11 1998); *In re Greystone III Joint Venture,* 995 F. 2d 1274 (CA5 1991) *(per curiam)* (vacating prior panel decision regarding new value exception apparently in light of *Dewsnup*); 995 F. 2d, at 1285 (Jones, J., dissenting); *In re Kirchner,* 216 B. R. 417, 418 (Bkrtcy. Ct. WD Wis. 1997); *In re Bowen,* 174 B. R. 840, 852–853 (Bkrtcy. Ct. SD Ga. 1994); *In re Dever,* 164 B. R. 132, 138 (Bkrtcy. Ct. CD Cal. 1994); *In re Mr. Gatti's, Inc.,* 162 B. R. 1004, 1010 (Bkrtcy. Ct. WD Tex. 1994); *In re Taffi,* 144 B. R. 105, 112–113 (Bkrtcy. Ct. CD Cal. 1992), rev'd, 72 A. F. T. R. 2d ¶ 93–5408, p. 93–6607 (CD Cal. 1993), aff'd in part and rev'd in part, 68 F. 3d 306 (CA9 1995), aff'd as modified, 96 F. 3d 1190 (CA9 1996) (en banc), cert. denied, 521 U. S. 1103 (1997); *In re A. V. B. I., Inc.,* 143 B. R. 738, 744–745 (Bkrtcy. Ct. CD Cal. 1992), holding rejected by *In re Bonner Mall Partnership,* 2 F. 3d 899, 912–913 (CA9 1993), cert. granted, 510 U. S. 1039, vacatur denied and appeal dism'd as moot, 513 U. S. 18 (1994).

to their participation.[1]  As we have on two prior occasions,[2] we granted certiorari in this case to decide whether 11 U. S. C. § 1129(b)(2)(B)(ii) of the 1978 Act preserved or repealed this "new value" component of the absolute priority rule.  I believe the Court should now definitively resolve the question and state that a holder of a junior claim or interest does not receive property "on account of" such a claim when its participation in the plan is based on adequate new value.

The Court today wisely rejects the Government's "starchy" position that an old equity holder can never receive an interest in a reorganized venture as a result of a cramdown unless the creditors are first paid in full.  *Ante*, at 451.[3]  Nevertheless, I find the Court's objections to the plan

---

[1] As Justice Douglas explained in *Case* v. *Los Angeles Lumber Products Co.*, 308 U. S. 106, 121–122 (1939) (footnote omitted):

"It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in *Northern Pacific Ry. Co.* v. *Boyd*[, 228 U. S. 482 (1913),] and *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co.*[, 271 U. S. 445 (1926)].  Especially in the latter case did this Court stress the necessity, at times, of seeking new money 'essential to the success of the undertaking' from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made. . . .

"In view of these considerations we believe that to accord 'the creditor his full right of priority against the corporate assets' where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder."

[2] See *Norwest Bank Worthington* v. *Ahlers*, 485 U. S. 197, 203, n. 3 (1988); *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U. S. 18 (1994).

[3] As I noted earlier, see n. 1, *supra*, Justice Douglas made this proposition clear in *Case* v. *Los Angeles*, *supra*.  Justice Douglas was a preeminent bankruptcy scholar, well known for his views on the dangers posed by management-controlled corporate reorganizations.  Both his work on the Protective Committee Study for the Securities and Exchange Commis-

before us unsupported by either the text of § 1129(b)(2)(B)(ii) or the record in this case. I would, therefore, affirm the judgment of the Court of Appeals.

## I

Section 1129 of Chapter 11 sets forth in detail the substantive requirements that a reorganization plan must satisfy in order to qualify for confirmation.[4] In the case of dissenting creditor classes, a plan must conform to the dictates of § 1129(b). With only one exception, the requirements of §§ 1129(a) and 1129(b) are identical for plans submitted by stockholders or junior creditors and plans submitted by other parties. That exception is the requirement in § 1129(b)(2)(B)(ii) that no holder of a junior claim or interest may receive or retain any property "on account of such junior claim or interest."

When read in the light of Justice Douglas' opinion in *Case v. Los Angeles Lumber Products Co.*, 308 U. S. 106 (1939), the meaning of this provision is perfectly clear. Whenever a junior claimant receives or retains an interest for a bargain price, it does so "on account of" its prior claim. On the other

---

sion and on Chapter X of the Bankruptcy Act sought to "restore the integrity of the reorganization process" which "too often [was] masterminded from behind the scenes by reorganization managers allied with the corporation's management or its bankers." Jennings, Mr. Justice Douglas: His Influence on Corporate and Securities Regulation, 73 Yale L. J. 920, 935–937 (1964). To this end, Douglas placed special emphasis on the protection of creditors' rights in reorganizations. Hopkirk, William O. Douglas—His Work in Policing Bankruptcy Proceedings, 18 Vand. L. Rev. 663, 685 (1965). I find it implausible that Congress, in enacting the Bankruptcy Code, intended to be even more strict than Justice Douglas in limiting the ability of debtors to participate in reorganizations.

[4] "Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case. Section 1129 provides the requirements for such confirmation, containing Congress' minimum requirements for allowing an entity to discharge its unpaid debts and continue its operations." 7 Collier on Bankruptcy ¶ 1129.01, p. 1129–10 (rev. 15th ed. 1998).

hand, if the new capital that it invests has an equivalent or greater value than its interest in the reorganized venture, it should be equally clear that its participation is based on the fair price being paid and that it is not "on account of" its old claim or equity.

Of course, the fact that the proponents of a plan offer to pay a fair price for the interest they seek to acquire or retain does not necessarily mean that the bankruptcy judge should approve their plan. Any proposed cramdown must satisfy all of the requirements of § 1129 including, most notably, the requirement that the plan be "fair and equitable" to all creditors whose claims are impaired. See § 1129(b)(1). Moreover, even if the old stockholders propose to buy the debtor for a fair price, presumably their plan should not be approved if a third party, perhaps motivated by unique tax or competitive considerations, is willing to pay an even higher price. Cf. § 1129(c).

In every reorganization case, serious questions concerning the value of the debtor's assets must be resolved.[5] Nevertheless, for the purpose of answering the legal question presented by the parties to this case, I believe that we should assume that all valuation questions have been correctly answered. If, for example, there had been a widely advertised auction in which numerous bidders participated, and if the plan proposed by respondents had been more favorable by a wide margin than any competing proposal, would § 1129(b)(2)(B)(ii) require rejection of their plan simply because it provides that they shall retain 100% of the equity?

Petitioner and the Government would reply "yes" because they think § 1129(b)(2)(B)(ii) imposes an absolute ban on participation by junior claimants without the consent of all senior creditors. The Court correctly rejects this extreme position because it would make the words "on account of"

---

[5] See Warren, A Theory of Absolute Priority, 1991 Ann. Survey Am. L. 9, 13 ("In practice, no problem in bankruptcy is more vexing than the problem of valuation").

superfluous, and because there is no plausible reason why Congress would have desired such a categorical exclusion, given that in some cases old equity may be the most likely source of new capital. See *ante*, at 452–453. Indeed, the dissenting judge in the Court of Appeals thought "such a result would border on the absurd."[6] Thus, neither the dissenting judge in the Court of Appeals nor the Court appears to be in doubt about the proper answer to my hypothetical question. Instead, the decision is apparently driven by doubts concerning the procedures followed by the Bankruptcy Judge in making his value determinations, implicitly suggesting that the statute should be construed to require some form of competitive bidding in cases like this.[7] See *ante*, at 456–458.

Perhaps such a procedural requirement would be a wise addition to the statute, but it is surely not contained in the

---

[6] Judge Kanne wrote in dissent: "Perhaps the majority's reasoning is driven by the fear that a 'but for' interpretation would prevent old equity from ever participating in a reorganized entity—something Congress could never have intended. Indeed, such a result would border on the absurd, but a simpler, 'but for' causation requirement would not preclude junior interests from participating in a reorganized entity. If prior equity holders earn their shares in an open auction, for example, their received interests would not be 'on account of' their junior interests but 'on account of' their capital contributions." *In re 203 N. LaSalle Street Partnership*, 126 F. 3d 955, 972 (CA7 1997).

It would seem logical for adherents of this view also to find participation by junior interests in the new entity not "on account of" their prior interest, if it were stipulated that old equity's capital contributions exceeded the amount attainable in an auction, or if findings to that effect were not challenged.

[7] This doubt is unwarranted in this case. The bank does not challenge the Bankruptcy Court's finding that the 15 floors of office space had a market value of $55.8 million. The bank's original expert testimony on the value of the property differed from the Bankruptcy Judge's finding by only 2.8%. *In re 203 N. LaSalle Street Partnership*, 190 B. R. 567, 573–576 (Bkrtcy. Ct. ND Ill. 1995). Therefore, although the bank argues that the policy implications of the "new value debate" revolve around judicial determinations of the valuation of the relevant collateral, Brief for Petitioner 5, n. 2, this concern was neither squarely presented in this case nor preserved for our review.

present text of § 1129(b)(2)(B)(ii). Indeed, that subsection is not a procedural provision at all. Section 1129 defines the substantive elements that must be met to render plans eligible for confirmation by the bankruptcy judge after all required statutory procedures have been completed. Cf. § 1121 (Who may file a plan); § 1122 (Classification of claims or interests); § 1125 (Postpetition disclosure and solicitation); § 1126 (Acceptance of plan); § 1127 (Modification of plan). Because, as I discuss below, petitioner does not now challenge either the procedures followed by the Bankruptcy Judge or any of his value determinations, neither the record nor the text of § 1129(b)(2)(B)(ii) provides any support for the Court's disposition of this case.

## II

As I understand the Court's opinion, it relies on two reasons for refusing to approve the plan at this stage of the proceedings: one based on the plan itself and the other on the confirmation procedures followed before the plan was adopted. In the Court's view, the fatal flaw in the plan proposed by respondent was that it vested complete ownership in the former partners immediately upon confirmation, *ante*, at 454, and the defect in the process was that no other party had an opportunity to propose a competing plan.

These requirements are neither explicitly nor implicitly dictated by the text of the statute. As for the first objection, if we assume that the partners paid a fair price for what the Court characterizes as their "exclusive opportunity," I do not understand why the retention of a 100% interest in assets is any more "on account of" their prior position than retaining a lesser percentage might have been. Surely there is no legal significance to the fact that immediately after the confirmation of the plan "the partners were in the same position that they would have enjoyed had they exercised an exclusive option under the plan to buy the equity

in the reorganized entity, or contracted to purchase it from a seller who had first agreed to deal with no one else." *Ibid.*

As to the second objection, petitioner does not challenge the Bankruptcy Judge's valuation of the property or any of his other findings under § 1129 (other than the plan's compliance with § 1129(b)(2)(B)(ii)). Since there is no remaining question as to value, both the former partners (and the creditors, for that matter) are in the same position that they would have enjoyed if the Bankruptcy Court had held an auction in which this plan had been determined to be the best available. That the court did not hold such an auction should not doom this plan, because no such auction was requested by any of the parties, and the statute does not require that an auction be held. As with all the provisions of § 1129, the question of compliance with § 1129(b)(2)(B)(ii) turns on the substantive content of the plan, not on speculation about the procedures that might have preceded its confirmation.

In this case, the partners had the exclusive right to propose a reorganization plan during the first 120 days after filing for bankruptcy. See § 1121(b). No one contends that that exclusive right is a form of property that is retained by the debtor "on account of" its prior status.[8] The partners did indeed propose a plan which provided for an infusion of $6.125 million in new capital in exchange for ownership of the reorganized debtor. Since the tax value of the partnership depended on their exclusive participation, it is unsurprising that the partners' plan did not propose that unidentified outsiders should also be able to own an unspecified portion of the reorganized partnership. It seems both practically and economically puzzling to assume that Congress would have expected old equity to provide for the participa-

---

[8] Indeed, as the Court acknowledges, *ante,* at 454, it is not "property" within the meaning of the Act.

tion of unknown third parties, who would have interests different from (and perhaps incompatible with) the partners', in order to comply with § 1129(b)(2)(B)(ii).[9]

Nevertheless, even after proposing their plan, the partners had no vested right to purchase an equity interest in the postreorganization enterprise until the Bankruptcy Judge confirmed the plan. They also had no assurance that the court would refuse to truncate the exclusivity period and allow other interested parties to file competing plans. As it turned out, the Bankruptcy Judge did not allow respondent to file its proposed plan, but the bank did not appeal that issue, and the question is not before us.[10]

The moment the judge did confirm the partners' plan, the old equity holders were required by law to implement the terms of the plan.[11] It was then, and only then, that what

---

[9] It goes without saying that Congress could not have expected the partners' plan to include a provision that would allow for the Bankruptcy Judge to entertain competing plans, since that is a discretionary decision exclusively within the province of the court. See § 1121(d).

[10] Apparently, the bank's plan called for liquidation of the property. In order to flesh out all facts bearing on value, perhaps the Bankruptcy Judge should have terminated the exclusivity period and allowed the bank to file its plan. That the bank's plan called for liquidation of the property in a single-asset context does not necessarily contravene the purposes of Chapter 11. See, e. g., In re River Village Associates, 181 B. R. 795, 805 (ED Pa. 1995).

[11] Section 1141(a) states: "Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan."

See 8 Collier on Bankruptcy ¶ 1141.02, at 1141-4 to 1141-5. ("Section 1141(a) of the Code provides that a plan is binding upon all parties once it is confirmed. Under this provision, subject to compliance with the requirements of due process under the Fifth Amendment, a confirmed plan

the Court characterizes as the critical "exclusive opportunity" came into existence. What the Court refuses to recognize, however, is that this "exclusive opportunity" is the function of the procedural features of this case: the statutory exclusivity period, the Bankruptcy Judge's refusal to allow the bank to file a competing plan, and the inescapable fact that the judge could confirm only one plan.

The Court's repeated references to the partners' "opportunity," see *ante*, at 454, 455, 456, is potentially misleading because it ignores the fact that a plan is binding upon all parties once it is confirmed. One can, of course, refer to contractual rights and duties as "opportunities," but they are not separate property interests comparable to an option that gives its holder a legal right either to enter into a contract or not to do so. They are simply a part of the bundle of contractual terms that have legal significance when a plan is confirmed.

When the court approved the plan, it accepted an offer by old equity. If the value of the debtor's assets has been accurately determined, the fairness of such an offer should be judged by the same standard as offers made by newcomers. Of course, its offer should not receive more favorable consideration "on account of" their prior ownership. But if the debtor's plan would be entitled to approval if it had been submitted by a third party, it should not be disqualified simply because it did not include a unique provision that would

of reorganization is binding upon every entity that holds a claim or interest . . ."); see also § 1142(a).

In this case, the plan provided: "The general partners and limited partners of the Reorganized Debtor shall contribute or cause to be contributed $6.125 million of new capital (the 'New Capital') to the Reorganized Debtor as follows: $3.0 million in cash ('Initial Capital') on the first business banking day after the Effective Date, and $625,000 on each of the next five anniversaries of the Effective Date." App. 38–39. The "Effective Date" of the plan was defined as "[t]he first business day after the Confirmation Order is entered on the docket sheet maintained for the Case." *Id.*, at 24.

not be required in an offer made by any other party, including the creditors.

Since the Court of Appeals correctly interpreted § 1129(b)(2)(B)(ii), its judgment should be affirmed.

Accordingly, I respectfully dissent.