In re RED MOUNTAIN MACHINERY COMPANY, Red Mountain Holdings, LLC, Red Mountain Pacific LLC, BTH, LLC, Debtors.

No. 2:09–bk–19166–RJH.

United States Bankruptcy Court, D. Arizona.

April 14, 2011.

Steven N. Berger, Engelman Berger, PC, Phoenix, AZ, for Debtors.

## ORDER ON CONFIRMATION

RANDOLPH J. HAINES, Bankruptcy Judge.

Pending before the Court is confirmation of the Debtor's First Amended Plan of Reorganization. The only objections to confirmation are those filed by the secured creditor Comerica Bank. Comerica objects that the plan is not feasible, that its classification of unsecured claims violates Bankruptcy Code § 1122,[1] that the interest to be paid on its secured claim is too low, that the term of payment of its secured claim is too long, and that the plan does not satisfy the new value corollary to the absolute priority rule with respect to Comerica's deficiency claim.

## Background Facts

The Debtor is an Arizona corporation formed in 1986 by Owen and Linda Cowing, who are the Debtor's only shareholders. Although they are no longer married, the Cowings jointly manage the Debtor's business operation in their respective capacities as president and secretary.

The Debtor's business consists of the rental of large earth moving equipment, primarily Caterpillars often referred to as "yellow iron," almost exclusively to licensed contractors. Its equipment is used primarily in four business sectors: commercial building, road building, other infrastructure construction, and residential building. During the height of the housing boom perhaps as much as 30% of Debtor's business was in residential construction, but today it is only about 1%.

The Debtor's business model is to purchase and rent out older, used equipment but to maintain it extremely well according to regular maintenance schedules. In addition, the Debtor has maintenance staff that can respond quickly if a machine breaks down on the job, either to repair it or to substitute replacement equipment. Over the past quarter century the Debtor has built a reputation for reliability and minimal downtime, and because it does not buy or use new equipment it can charge lower rental rates than its principal competitor.

---

1. Unless otherwise noted, all statutory citations are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

By 2001, the Debtor had expanded its operations both into southern California and southern Nevada, owned more than 300 machines, employed more than 140 people, and produced annual gross revenues in excess of $43 million. As a result of the economic downturn beginning in 2007, however, its annual revenues declined to $10 million for 2008.

Since 2003, the Debtor has been financed by a revolving line of credit with Comerica Bank. By the time the Chapter 11 was filed in August, 2009, the Comerica debt was approximately $33 million. The debt is guaranteed by Owen and Linda Cowing.

In the spring of 2008, the decline in revenues caused non-monetary defaults in the Comerica debt, which led to a series of forbearance agreements and workout negotiations. At about that same time Owen Cowing was diagnosed with leukemia, and therefore turned over primary responsibility for the workout negotiations to the Debtor's then-Chief Financial Officer Darren Dierich. Dierich continually advised that no workout solution could be negotiated with Comerica, and that Comerica insisted that the Debtor wind down its business operations, substantially reduce the amount of equipment it owned, and that it prepare for liquidation.

Although not directly at issue at this confirmation hearing,[2] the Debtor contends that in June, 2009, Owen Cowing discovered that Comerica had published a notice of the UCC sale of the Debtor's business. Subsequently, he discovered secret e-mails between Comerica and his CFO Dierich that revealed a plan for Comerica to sell the Debtor's assets to an entity owned and controlled by Dierich, with the purchase to be financed by Comerica, so that Dierich could take over the Debtor's business for his own benefit. Comerica and Dierich had agreed to keep their plan secret from the Cowings, according to the Debtor.

In June, 2009, the Debtor advised Comerica of its discovery of the secret sale plan and that it might have claims against Comerica as a result. In August, 2009, Comerica advised that it would not approve payment of any weekly expenses, including payroll, that had routinely been paid out of Comerica's revolving line. Because it could not fund payroll or pay trade vendors, the Debtor filed this Chapter 11 petition on August 11, 2009.

The Debtor has filed an adversary proceeding asserting claims against Comerica arising from the secret sale scheme, including equitable subordination and damages for aiding and abetting breaches of fiduciary duty. That adversary proceeding is currently pending before Bankruptcy Judge Case and is not scheduled for trial until 2012. Comerica's primary defense is not to deny the facts as alleged by the Debtor, but to argue that there was no damage to the Debtor because the scheme was discovered before the sale could be concluded.

### Procedural Background

Although the Debtor had been downsizing in 2007 and 2008, by the petition date it owned approximately 180 items of major equipment. About two months after the filing, the Debtor received a bid from an auction company to purchase approximately 50% of the Debtor's equipment for a little over $5 million. After initially opposing the sale, Comerica eventually consented to the sale and made a credit bid of $7 million for the equipment. After the sale, the Debtor's remaining equipment was ap-

---

**2.** These facts and litigation are relevant to the existence of Class 9, to the contentiousness of the entire bankruptcy and to the classification holding of *In re Johnston,* 21 F.3d 323, 328 (9th Cir.1994).

proximately 83 pieces of major equipment along with approximately 50 attachments and tools.

The Debtor filed its plan of reorganization in December, 2009, and filed its first amended plan in October, 2010. In November, Comerica filed an election pursuant to Bankruptcy Code § 1111(b), seeking to have its approximate $25 million claim treated as fully secured. The Debtor objected pursuant to Code § 1111(b)(1)(B)(II), arguing that the § 1111(b) election is not available when the property has been sold under § 363. The parties briefed and argued the issues of whether the Code's language "is sold" may include a sale prior to confirmation and how the exception to the election applies when only some of "such property is sold." The Court concluded that "is sold" includes sales made prior to the election deadline, because "or is to be sold under the plan" refers to sales to be made after the election deadline. The Court also held that when there is a sale of only a portion of the property there must be a pro rata exclusion from the election. Pursuant to that ruling, for purposes of confirmation the parties have stipulated that the value of Comerica's collateral is $10 million and that Comerica's total claim pursuant to § 1111(b) is $15.9 million.

**The Plan**

The plan classifies Comerica's $15.9 million allowed secured § 1111(b) claim in Class 2. Pursuant to § 1129(b)(2)(A)(i)(II), although the principal amount of the claim is $15.9 million it need be paid only a present value of $10 million. The allowed secured claim will be paid with interest on $10 million at 5%, or such higher amount as the Court may deem appropriate. For the first year it will be paid in 12 monthly interest-only payments, and thereafter will be paid semiannual principal and interest payments based on a 20 year amortization, with the full balance due in 15 years. If Comerica had not made the § 1111(b) election, the full balance of the allowed secured claim would have been due and payable in five years.

The plan classifies Comerica's deficiency claim arising from the portion of its collateral that was sold, in the approximate amount of $9.8 million, in Class 7. All other unsecured claims, in the approximate amount of $4.5 million, are classified in Class 8. All 42 ballots cast in Class 8 accepted the plan. The allowed claims in Class 7 and 8 will share pro rata in a $100,000 pot to be funded on the effective date of the plan.

Both Comerica's secured and unsecured deficiency claims are treated as disputed claims under the plan. Until entry of a final order in the adversary proceeding, all payments due to Comerica on these claims will be deposited in a creditor reserve account. The plan designates Class 9 for any claims that are subordinated as a result of the adversary proceeding, and provides that the claims in Class 9 shall be paid in accordance with any final order in the adversary proceeding.

Class 3 consists of the secured property tax claims in the estimated amount of approximately $140,000. The plan provides these claims may be paid in quarterly payments over two years, with statutory interest. This class unanimously voted to accept the plan, as a result of the ballots cast by Maricopa County and Riverside County, California.

Class 4 consists of priority employee claims in the approximate amount of $12,000. The plan provides these claims may be paid in monthly installments over three years, together with simple interest at the rate of 4%. All four ballots cast in this class voted to accept the plan.

Class 5 consists of priority unsecured tax claims that the Debtor estimates to be approximately $13,000. The Arizona Department of Revenue stipulated to withdraw its objection to the plan and to vote its Class 5 priority claim in the amount of $5,663 in favor of the plan, as a result of which Class 5 unanimously accepted the plan.

Class 6 is the consignment claims that Debtor estimates to total approximately $196,000. The plan provides that the consignment agreements giving rise to these claims will be rejected, the Debtor will enter into new consignment agreements, and the creditors will be paid 90% of any monetary arrearage on the effective date. All four ballots cast in this class voted to accept the plan, in the approximate amount of $208,000.

Class 10 consists of the equity ownership of Owen and Linda Cowing. The plan provides that their equity ownership shall be extinguished and that on the effective date the Cowings shall contribute the $480,000 cash payable on their administrative claim in exchange for 100% of the equity of the reorganized debtor. A modification filed shortly before the confirmation hearing clarified that this is to be a cash contribution. In addition, there is an exit loan facility in the amount of $1.25 million to be funded by the Cowings. Together with cash on hand, this will be much more than sufficient to pay all administrative claims, including the Cow-

ings', which will enable them to make their cash contribution to the Debtor, and also to fund a capital reserve.

The only rejections of the plan were cast by Comerica, both in Class 2 and Class 7.

## Classification

Relying on the Ninth Circuit BAP's decision in *Tucson Self–Storage*[3] and its reliance on the Fifth Circuit's holding in *Greystone*,[4] Comerica argues that the plan's classification of the Comerica deficiency claim in class 7 and all other general unsecured claims in class 8 violates the case law that prohibits "gerrymandering." But the gerrymandering analysis does not apply on these facts, for two reasons: the claims are not substantially similar under Ninth Circuit law, and the separate classification is not necessary in order to satisfy Code § 1129(a)(10) and therefore not "gerrymandering."

The gerrymandering analysis applies only when similar claims are separately classified. It has no application to the classification of dissimilar claims. This is so for three reasons. First, Code § 1122 explicitly *requires* substantially dissimilar claims to be placed in separate classes.[5] Second, the Ninth Circuit has recognized that requirement for separate classification of dissimilar claims in a case decided after both *Greystone* and *Tucson Self–Storage*.[6] So there could be no gerrymandering interpretation that would require what the Code and the Ninth Circuit expressly pro-

---

3. *Oxford Life Ins. Co. v. Tucson Self–Storage, Inc. (In re Tucson Self–Storage, Inc.),* 166 B.R. 892 (9th Cir. BAP 1994).

4. *Phoenix Mutual Life. Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 995 F.2d 1274 (5th Cir.1991).

5. "Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Code § 1122(a). The exception in subparagraph (b) applies only to small claims that may be classified together for "administrative convenience," and there is no contention here that either class 7 or class 8 would fall within that exception.

6. *Barakat v. The Life Ins. Co. (In re Barakat),* 99 F.3d 1520, 1524 (9th Cir.1996) ("dissimilar claims may not be put in the same class").

hibit—the placing of dissimilar claims in the same class. Finally, the analysis and holdings of both *Greystone*[7] and *Tucson Self-Storage*[8] expressly applied only to the classification of *substantially similar* claims. Those analyses and holdings simply have no application when the issue is how dissimilar claims are classified.

■ Here, the Court finds as a fact that the deficiency claim of Comerica and the general unsecured claims are not substantially similar. This factual finding is based on the undisputed facts that (1) Comerica's deficiency claim may be paid from a non-debtor source, namely by the guarantees of Owen and Linda Cowing,[9] whereas none of the general unsecured claims is so guaranteed; (2) Comerica's deficiency claim, unlike all the other unsecured claims, is embroiled in litigation with the Debtor, as a result of which it may be equitably subordinated, equitably disallowed, or offset by the Debtor's own claims against Comerica; and (3) the deficiency claim could be paid in full and/or differently than are all other unsecured claims, because the Plan provides that the claims in Class 9 shall be paid in accordance with any final order in the adversary proceeding. These facts are virtually identical to the facts in *Johnston*,[10] where the Ninth Circuit affirmed the bankruptcy court's finding that the disputed and otherwise secured deficiency claim was not substantially similar to the general unsecured claims. And even apart from the holding in *Johnston*, these facts support the finding that the claims are not substantially similar for all the other reasons this Court analyzed in its recent findings and opinion in *Loop 76*.[11]

■ Moreover, even if the claims were not dissimilar, the gerrymandering analysis would not prohibit their separate classification on the facts here, where there are other classes that are impaired and have accepted the plan. It is undisputed that Class 3 (secured property tax claims of Maricopa and Riverside Counties), Class 4 (priority employee claims), Class 5 (priority unsecured tax claims) and Class 6 (consignment claims) are all impaired and have accepted the plan. Because each of these classes satisfies Code § 1129(a)(10), there is no need nor motivation to classify Comerica's deficiency claim separately from Class 8 so that Class 8's acceptance of the plan can satisfy the accepting impaired class requirement.

■ Because it is clearly not the case that the "sole purpose of Debtor's separate classification [of the deficiency claim] was to obtain acceptance of the Plan"[12] in order to satisfy § 1129(a)(10), the gerrymandering limitation on classification does not apply. And because § 1122 does not otherwise prohibit the separate classification

---

7. "[T]he one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify *similar* claims differently in order to gerrymander an affirmative vote on a reorganization plan." 995 F.2d at 1279 (emphasis added).

8. "We conclude that if § 1122 permits classification of *'substantially similar'* claims in different classes, *such* classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." 166 B.R. at 897 (emphasis added).

9. And the Court may take judicial notice that they have been sued by Comerica on their guarantees, and that litigation is currently pending in Federal District Court in Texas.

10. *Steelcase, Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 328 (9th Cir.1994).

11. *In re Loop 76, LLC*, 442 B.R. 713 (Bankr. D.Az.2010).

12. *Barakat*, 99 F.3d at 1526.

of similar claims,[13] the classification of claims in the Debtor's First Amended Plan does not violate either the Code or the case law on gerrymandering.

## Feasibility

■ The evidence at the confirmation hearing consisted of only three witnesses. The only fact witness was Dave Gonzales, the Debtor's Chief Restructuring Officer and Chief Financial Officer (who replaced Darren Dierich). The Debtor also submitted a report, declaration and testimony from its expert witness Ed McDonough, and Comerica submitted a declaration and testimony from its expert Grant Lyon.

Mr. Gonzales testified to the Debtor's operating results since the petition. At the first cash collateral hearing in August of 2009, the Debtor had budgeted that it would double its sales within eight weeks and it would improve its cash position by approximately $7,000. In fact, the Debtor increased its machines on rent from 11 to 27, generated revenues in excess of that first budget by almost $43,000, and improved its cash position by $19,000.

At the beginning of 2010, the Debtor had projected $3.1 million in gross revenues and $126,000 of EBIDTA.[14] In fact, the Debtor's actual 2010 revenues exceeded $4.3 million and resulted in EBIDTA of $816,000.

Comerica presented no factual or opinion evidence to the contrary, and effectively does not dispute the evidence that the Debtor's operations during this case substantially outperformed its own projections.

Mr. Gonzales prepared and testified to income projections covering the 15 year term of the plan. He testified they were based on a conservative 2% growth rate. The projections reflect more than a million dollars of EBIDTA available *after* bank debt service (at 6% interest) for the year 2011, around $800,000 of excess EBIDTA after service of bank debt for the years 2012 and 2013, and well over a million dollars of excess EBIDTA after service of bank debt for the years 2014 through 2023, after which it exceeds $2 million. He testified that these projections had already been met and significantly exceeded for the first quarter of 2011. He testified that the Debtor can easily make required plan payments for the first two years based on *current* performance, and that the trend of performance was steadily upward. He testified that the sales he is projecting for the future have been achieved by the Debtor in its recent past. He also noted that the Debtor's business model—consisting of leasing older but meticulously maintained equipment—is better suited to the current economic climate because the Debtor's older machines move dirt as well as brand new machines at a fraction of the cost. Moreover, newer machines have suffered from some quality issues and a greater proportion of them are being shipped offshore, resulting in increased demand for the Debtor's used machines.

Finally, Mr. Gonzales testified that his projections resulted in a low debt service coverage ratio in 2012 of 1.74 and a high debt service ratio of 4.2 in 2020. Based on his 25 years experience in underwriting bank debt, primarily consisting of his 18 years with Wells Fargo, he testified that a debt service coverage ratio of 1.25 was

---

13. *Id.* at 1524. When similar claims are separately classified, their rights are protected by § 1129(b)(1), which prohibits unfair discrimination. Because the plan treats classes 7 and

8 identically, the unfair discrimination prohibition is neither implicated nor violated.

14. "EBIDTA" stands for earnings before interest, depreciation, taxes and amortization.

considered "very good." He concluded that he believed "the projections have a high probability of not only being achieved but as in the Chapter 11 to date, exceeded."

Comerica presented no fact or expert testimony to the contrary. Indeed, Comerica's expert Mr. Lyon testified that the Debtor's plan was feasible, and not likely to result in any further need for a financial reorganization, if the Debtor met its projections. Mr. Lyon also testified that he assumed management was competent in preparing its projections. Mr. Lyon's report testified that he "determined that the Debtor can pay the projected interest and amortization payments under the Plan if it consistently achieves the projections," and even "could pay an interest rate of up to 10.7% and still be cash flow positive or break even over the next five years if it consistently reaches" its projections.

Mr. Lyon did not prepare his own projections, nor did he undertake any factual evaluation that would enable him to do so. He did not interview the Debtor or its CFO, or any of the Debtor's customers or competitors, did not review the Debtor's business model, did not view the Debtor's operations, and had no particular experience in the equipment rental field.

Mr. Lyon's principal argument was that the Debtor would need to maintain a utilization rate of its equipment between 50 and 55% over the next five years in order to meet its projections and pay Comerica's debt under the plan. Mr. Lyon conceded that the Debtor in fact exceeded the 50% utilization rate during November and December 2010 and January 2011. In order to suggest that a utilization rate in excess of 50% was not feasible, Mr. Lyon had to average the entire prior 12 months. But he did not provide any facts or opinion, nor did the bank make any argument, that the November, December and January actual results were seasonal aberrations.

Often, the feasibility of a 15–year payment plan is found lacking due to evidence that there is little credibility to 15–year projections.[15] Here, however, the Debtor's witness testified that, primarily due to the significant amortization of the debt over 15 years, the Debtor would have little difficulty paying or financing the balloon payment in 15 years.[16] Comerica presented no fact or opinion testimony to the contrary.

Based on his 22 years experience in the asset based lending industry and another decade as a middle market capital investor and financial adviser, as well as his demeanor on the stand and his answers on cross examination, the Court finds Dave Gonzales to be an extremely credible witness. He is not a professional witness. His projections appear to be very sound and conservative, particularly as demonstrated by the fact that the Debtor has out performed them consistently during this bankruptcy case.

Based on Mr. Gonzales testimony, and the lack of any fact or expert opinion testimony to the contrary, the Court finds both the projections and the plan to be feasible, within the meaning of Code § 1129(a)(11).

**Interest Rate**

■ The Debtor's expert witness Ed McDonough testified to an interest rate of 6%, based on the relevant risk factors

**15.** *But see, e.g., Appeal of California Gulf Partnership,* 48 B.R. 959, 962, 964 (E.D.La.1984) (the court finds it reasonable to expect the debtor to confirm a plan based on a 17–year payout of debt secured by a supply boat that has a remaining useful life of 17 years).

**16.** *See* text accompanying notes 29–30, *infra.*

identified in *Till*.[17] Dave Gonzales' declaration opined to a *Till* interest rate of 5%, but this testimony was excluded as expert opinion that was not timely disclosed. Comerica's expert Grant Lyon testified to an interest rate range between 8.5% to 10.5%.

Comerica's expert did not indicate his conclusion was based on the risk factors identified in *Till*. To the contrary, his conclusion was based on "a survey of publically-reported debt issued by borrowers roughly comparable to the Debtor." Based on factors such as total debt/EBIDTA, EBIDTA interest coverage and total debt, he concluded that the appropriate credit rating for the Debtor (if it were a publically issued debt) would be CCC. He also considered the bonds issued by four public equipment lenders (United Rentals, RSC Holdings,[18] H & E Equipment and Mobile Mini), but apparently rejected that comparison because he concluded their bonds are perceived by the market to be less risky than CCC, and therefore not comparable with the Debtor. He also noted that the bond rates reported by Merrill Lynch and Bloomberg are not comparable because they are composed largely of unsecured bonds, whereas Comerica's claim is secured. Comerica's expert therefore relied on a method to "blend" a rate derived from RSC's senior secured bonds, at 7%, with Merrill Lynch's CCC rated composite bond index of 11.4%, to arrive at a blended rate of 9.5%.

Except for the isolated fact that RSC's secured bond rating is 7%, the Court finds little of use in Mr. Lyon's analysis, because it does not comport with the procedure required by *Till*.[19]

In order to conclude the interest rate should be significantly higher than RSC's senior secured 2017 bonds that are currently yielding 7%, Comerica's expert concluded that rate should apply only to 65% of Comerica's secured debt, because 65% is "an appropriate loan-to-value metric that banks would use to extend secured financing on the collateral." He then concluded that the remaining 35% of Comerica's secured claim should be regarded as "unsecured" (quotation marks in original) and bear the interest rate for unsecured bonds, which he concluded was 11.4%. Comerica's expert then mathematically blended

17. *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) (the appropriate interest rate to yield present value should be determined by adjusting the prime rate by risk factors, generally in the range of 1½ to 3%).

18. The Court believes that RSC stands for Rental Service Company, which as the name implies may be a competitor of the Debtor, although its business model may consist more of renting to home owners and consumers rather than medium to large licensed contractors.

19. Although *Till* was a chapter 13 case, the Court indicated that the relevant statutory language—"value, as of the effective date of the plan"—requires a court to discount a steam of deferred payments back to their present dollar value. 541 U.S. at 474 & n. 10, 124 S.Ct. 1951. And because this statutory language is identical in the present §§ 1325(a)(5)(B)(ii) and 1129(b)(2)(A)(i)(II), the Court held that "we think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions." *Id.* The only possible difference the Court noted was that there might be an efficient market for financing loans to Chapter 11 debtors, and that if such a market were available it would be appropriate to consider what rate such an efficient market would dictate. *Id.* at 477 n. 14, 124 S.Ct. 1951. Here, however, all parties and experts agreed there is no market for a loan equivalent to the plan's treatment of Comerica's secured debt, so that possible exception to *Till's* analysis in a chapter 11 case does not apply.

these rates to arrive at 9.5% for the aggregate secured debt.

There are several problems with this approach. First, and most obviously, 35% of Comerica's secured claim is not unsecured. Rather, it is fully secured. There is no basis to treat it as unsecured when the fact is that it is secured. Treating a portion of the secured debt as unsecured is directly contrary to *Till's* holding that the risk factors should be based on "the characteristics of the [actual] loan," [20] and its rejection of risk factors that might be considered for hypothetical or allegedly comparable loans in the market.[21]

Second, the secured portion of the debt secured by Mr. Till's pickup truck was similarly secured to the full extent of the value of the collateral.[22] The *amicus* brief for commercial lenders argued that the Supreme Court should adopt this same "investment band" approach that Comerica's expert used.[23] But despite the fact that Till's debt was similarly 100% loan-to-collateral value and this "investment band"

approach was argued, the Supreme Court's opinion did not adopt it.[24]

Third, the Court specifically rejected the almost identical "coerced loan" approach.[25] It rejected the argument that the interest rate necessary to provide present value must be determined as if the lender were making an entirely new loan, which is the only basis for arguing that a comparable secured debt interest rate should be applied to only 65% or 80% of the debt. The Court's rejection of the coerced loan approach in *Till* was consistent with its previous holding in *Rash*, where the Court similarly cautioned that cramdown of secured debt should not be analyzed as if the debtor were getting a new vehicle secured by a new loan. The Court there noted that adjusting the principal on an existing debt is not the same as making a new loan and does not provide the debtor with the same benefits nor impose on the creditor the same burdens as exist in a new purchase and loan transaction.[26]

---

20. *Id.* at 479, 124 S.Ct. 1951.

21. *See* note 25 *infra* and accompanying text.

22. The total debt was $4,894, but the value of the truck was only $4,000, so pursuant to Code § 506 the allowed amount of the secured claim was limited to $4,000, 541 U.S. at 470, 124 S.Ct. 1951, resulting in a 100% loan-to-collateral value ratio.

23. *Till v. SCS Credit Corporation*, Amicus Brief for Commercial Lenders in Support of Respondent, 2003 WL 22466038 (October 24, 2003), at *10–11 ("This is known as the 'investment band' approach. Thus, for example, a borrower seeking to obtain financing in an amount equal to 100% of the market value of the property it owned might receive a loan for an amount equal to 80% of its property on a secured basis. This loan would be oversecured by the collateral as a whole and would accordingly be available at a lower interest rate. The remaining 20% of the financing might then be a combination of junior debt—either unsecured or secured by a junior lien

and, therefore, far riskier and at a much higher rate of interest—and an equity interest in the borrower.").

24. *Till v. SCS Credit Corp.*, 541 U.S. 465, 478, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) ("The formula approach has none of these defects.").

25. 541 U.S. at 477, 124 S.Ct. 1951 ("These considerations lead us to reject the coerced loan ... approach[].... For example, the coerced loan approach requires bankruptcy courts to consider evidence about the market for comparable loans to similar (though non-bankrupt) debtors.... In addition, the approach overcompensates creditors because the market lending rate must be high enough to cover factors, like lenders' transaction costs and overall profits, that are no longer relevant in the context of court-administered and court-supervised cramdown loans.").

26. *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 965 n. 6, 117 S.Ct. 1879, 138

Finally, in identifying the risk factors that must be considered, the *Till* Court did not include the loan-to-collateral value ratio. The only risk factors that it required to be considered are the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan.[27] The characteristics of the loan are its secured or unsecured nature, its term, its interest rate and its installment payment and amortization schedule, not the value of the collateral as compared to the loan.

Mr. McDonough's report considered a total of twelve risk factors, of which nine were positive and three were negative. The positive risk factors included the Debtor's twenty year history, its improving operating results in 2010, its sophisticated system to ensure proper maintenance, its budgeted $500,000 in capital expenditures each year, the expected long term growth in Arizona, the near term reduction in competition, the positive cash flow for each year in the projections, the projected EBIDTA more than sufficient to cover debt service, and the debt service coverage ratios from 1.3 to 3.8% and improving over time. The negative factors including the slow economic recovery in Arizona, the fifteen year payout, and a balloon payment in year fifteen.

In addition, neither expert considered the effect of the Cowings' guarantees, even though Dave Gonzales' declaration indicated they are both solvent and that Linda Cowing has sufficient liquid assets

to provide the funding source for the exit loan. And it appears that prior to the bankruptcy case, Comerica's interest rates ranged from a high of prime plus 1% (currently approximately 4.25%) to a low of prime plus 0.65% (currently approximately 3.6%).[28] Although *Till* rejected the presumptive contract rate approach as determinative of an interest rate, the pre-bankruptcy rate nevertheless provides some evidence of the risk factors inherent on lending on this type of collateral.

Probably the most difficult risk factor to evaluate is the fifteen year payment term. Mr. McDonough's report does not give any specific analysis of how much this risk factor should count for. Mr. Lyon testified that the difference between a one year and a fifteen year treasury bill is about 4.6%. Based on that, Mr. McDonough's analysis does not seem to give sufficient consideration to the magnitude of the risk factor of the long term payout. On the other hand, that risk factor may be substantially mitigated by the fact that this is secured debt, that it will be significantly amortized over the fifteen years, and that it is guaranteed by solvent guarantors. The amortization is particularly significant, because it means that when the balloon becomes due in 15 years, the balance will be, at most, $3.43 million.[29] It is because of this substantial reduction of the secured debt due to the amortization payments that Mr. Gonzales was able to testify that, based on his substantial banking experi-

L.Ed.2d 148 (1997) ("A creditor should not receive portions of the retail price, if any, that reflect the value of items that the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning.").

27.  541 U.S. at 479, 124 S.Ct. 1951.

28.  Dave Gonzales so testified in paragraph 168 of his declaration. Comerica objected to

that paragraph as being among those providing expert opinion that was not timely disclosed. On review, however, it appears to be fact testimony rather than opinion testimony. And Mr. Gonzales also testified orally, without objection, that the loan relationship with Comerica originated in 2003 and that the interest rates ranged from as low as 4% to a little over 5%.

29.  Gonzales Declaration ¶ 161.

ence, the Debtor "will be well positioned to obtain any necessary financing to satisfy the 15 Year Balloon Payment," and that "favorable financing" would be available to do so "without regard to the value of its equipment."[30]  As noted, Comerica presented no facts, opinion or testimony to the contrary.

Based on the combination of these positive and negative factors, the Court finds that an appropriate interest rate would be somewhat closer to the RSC 2017 bond debt rating of 7% than Mr. McDonough opined, but the existence of the guarantee and the significantly amortized debt (whereas most bonds are not amortized) suggests the rate need not be as high as the RSC secured bond rate.  Consequently, based on all the testimony and risk factors, the Court finds and concludes that an appropriate rate necessary to provide Comerica with the present value of the amount of its allowed secured claim is 6.5%.

**New Value Corollary**

Finally, Comerica objects that the plan violates the absolute priority rule and its new value corollary that both the Supreme Court and the Ninth Circuit have recognized and defined.

The absolute priority rule is defined by the Supreme Court's opinion in *Case v. Los Angeles Lumber*.[31]  That case held that the term "fair and equitable" as used in the first general corporate reorganization statute, § 77B, incorporated this "rule of full or absolute priority."[32]  In 1978

Congress incorporated the Court's absolute priority rule in Code § 1129(b)(1) by allowing the confirmation of a plan over the rejection of a class of unsecured creditors only on a finding that it is "fair and equitable."  And Congress partially codified the Court's definition of the absolute priority rule by specifying part of what the rule "includes" in § 1129(b)(2)(B)(ii).  But by introducing this partial codification by the defined term "includes,"[33] Congress also made expressly clear that it did not intend § 1129(b)(2)(B)(ii) to define the entirety of the absolute priority rule.

■  The portion of the absolute priority rule that is codified provides in relevant part that if a rejecting class of unsecured claims is not paid in full, then "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."  Here, the rejecting class of unsecured claims is Class 7, consisting of the Comerica deficiency claim, and the junior class of interests consists of the equity ownership interests of the Cowings.  Because Comerica's deficiency claims is not paid in full and has rejected the plan, what the rule therefore requires is that the Cowings may not retain their equity interests merely "on account of" the fact that they owned those interests as of the filing of the case.

■  What the Ninth Circuit pellucidly held in *Bonner Mall*[34] was that a necessary logical corollary[35] of this rule, both

---

30.  *Id.,* ¶¶ 161 & 162.

31.  *Case v. Los Angeles Lumber Products Co., Ltd.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

32.  *Id.* at 117, 60 S.Ct. 1.

33.  " '[I]ncludes' and 'including' are not limiting."  Code § 102(3).

34.  *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership),* 2 F.3d 899 (9th Cir.1993), *appeal dismissed as moot,* 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994).

35.  Although recognizing that it is often referred to as an "exception" and often using that terminology as well, the *Bonner Mall* opinion expressly held that it is not an excep-

as adopted in *Case v. Los Angeles Lumber* and as partially codified in § 1129(b)(2)(B)(ii), is that equity owners like the Cowings may receive equity interests in the Debtor "on account of" something other than their prior equity ownership interest, such as on account of a contribution of new value.

The Supreme Court has addressed the absolute priority rule at least twice since the Ninth Circuit's holding in *Bonner Mall.* First, in the *Bonner Mall* case itself the Supreme Court expressly declined to vacate the Ninth Circuit's opinion.[36] Second, although given the opportunity to overrule the new value corollary as recognized by both the Seventh and Ninth Circuits, the Court expressly declined to do so in *203 North LaSalle.*[37] Instead of overruling their interpretations of the new value corollary, the Supreme Court held that one or two[38] of the five elements of the new value corollary could not be satisfied when old equity retains the exclusive right to contribute the new value. Because it expressly declined to define what "on account of" requires except to hold that it cannot be satisfied when old equity has the exclusive right to propose a plan, the Supreme Court's holding in *203 North LaSalle* leaves intact the Ninth Circuit's holding in *Bonner Mall* whenever exclusiv-

tion but rather a corollary. "[W]e should note, preliminarily, that the term 'exception' is misleading. The doctrine is not actually an exception to the absolute priority rule but is rather a corollary principle, or, more simply a description of the limitations of the rule itself. It is, as indicated above, the set of conditions under which former shareholders may lawfully obtain a priority interest in the reorganized venture.... More properly, the new value exception should be called something like the 'new capital-infusion doctrine' or as one commentator has suggested, 'the scrutinize old equity participation rule.'" Elizabeth Warren, *A Theory of Absolute Priority,* 1991 Annual Survey of American Law 9, 42." 2 F.3d at 906–07. And the Supreme Court subsequently referred to the Ninth Circuit's *Bonner Mall* opinion as resting on "a new value corollary." *Bank of America National Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 443, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) ("The Seventh Circuit in this case joined the Ninth in relying on a new value corollary to the absolute priority rule to support confirmation of such plans."). Because of those holdings, this opinion will refer to it as the "new value corollary." *See also* Bruce A. Markell, *Owners, Auctions and Absolute Priority in Bankruptcy Reorganizations,* 44 Stan. L. Rev. 69 (1991) (demonstrating that new value is a logical corollary, not an exception); Randolph J. Haines, *The Unwarranted Attack on New Value,* 72 Am. Bankr. L.J. 387, 414 (1998) ("As an absolute priority rule decision, the only way the plan in *Kansas City*

*Terminal* could have been confirmable, as the Court said it was in both *Kansas City Terminal* and in *Case,* was as a new value plan. Consequently, there can be no remaining doubt that at least *Kansas City Terminal,* if not *Case,* is an on-point holding that new value is an inherent part of the fair and equitable rule.").

**36.** 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994).

**37.** *Bank of America National Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 443, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).

**38.** The holding of *203 North LaSalle* appears to be that in order to satisfy a new value corollary "it would thus be necessary for old equity to demonstrate its payment of top dollar, but this it could not satisfactorily do when it would receive or retain its property under a plan giving it exclusive rights and in the absence of a competing plan of any sort." 526 U.S. at 457, 119 S.Ct. 1411. It is not clear whether this "top dollar" requirement refers to the requirement that the new value contribution equal or exceed the value of the interest being retained, or whether it refers to the "necessity" element that the new value must come from the old equity holders. *See id.* at 453 n. 26, 119 S.Ct. 1411 (discussing how the "necessity" requirement may require old equity to pay more money than any other source).

ity [39] has terminated, as it has here.

■ The issue here, therefore, is whether the equity interests that the Cowings will obtain under this plan are "on account of" their former equity ownership, or instead are "on account of" their new value contribution of $480,000. And it is important to recognize that under controlling Ninth Circuit law, this is a purely factual determination, not a legal question: "[W]hether a particular plan gives old equity a property interest 'on account of' its old ownership interests in violation of the absolute priority rule or for another, permissible reason is a factual question." [40]

■ In *Bonner Mall*, the Ninth Circuit held that "if a proposed plan satisfies all of these [five] requirements, *i.e.*, the new value exception, it will not violate section 1129(b)(2)(B)(ii) of the Code and the absolute priority rule. Such a plan, [we agree], will *not* give old equity property 'on account of' prior interests, but instead will allow the former owners to participate in the reorganized debtor *on account of* a substantial, necessary, and fair new value contribution." [41] The five requirements are that the new value be "1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received." [42]

Dave Gonzales testified, without objection, that the plan as amended and modified "contemplates a cash infusion of approximately $1.25 million in contributions and loans by Owen and Linda Cowing that will be used to satisfy effective date obligations of the Debtor, including payment of administrative and priority claims, fund distributions to unsecured creditors, and recapitalize the Debtor going forward. The Exit Loan is to be funded by Linda Cowing, through a newly formed and wholly owned limited liability called, Arlington RMMC Investments, LLC." [43]

Comerica presented no evidence that the contributions required of the old equity holders were either not new or not money or money's worth. At closing argument, Comerica's counsel conceded that the contribution was both new and money or money's worth. Comerica's only evidence was the opinion testimony of Grant Lyon. Although as a financial analyst he may have been qualified to opine that the contributions are neither new nor money's worth, he expressed no opinion on those issues. Based on the uncontroverted testimony of Mr. Gonzales, the Court finds that the new value contributions are both new and money or money's worth.

■ Comerica argues, in a footnote, that the new value contributions "may not be necessary to the reorganization of the debtor." [44] But it presented no evidence in support of that argument.

---

39. Code § 1121(c)(2) provides that only the debtor may propose a plan within the first 120 days after the case is filed, and § 1121(d) provides that this period of exclusivity may be extended. Here, it is undisputed that the debtor's exclusive period to file a plan expired long ago.

40. *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership)*, 2 F.3d 899, 911 (9th Cir.1993), *appeal dismissed as moot*, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994).

41. *Id.* at 908–09 (emphasis in original).

42. *Id.* at 908, citing *Case v. Los Angeles Lumber*, 308 U.S. at 121–22, 60 S.Ct. 1.

43. Gonzales Declaration ¶ 103.

44. Comerica Objection to Confirmation of Debtor's First Amended Plan of Reorganization at 11, n.28.

The Disclosure Statement estimates that administrative claims will be approximately $880,000 (inclusive of the Cowings' $480,000 administrative claim). Mr. Gonzales' Declaration, which is in evidence, establishes that the Debtor's cash position as of March 22, 2011 was $522,000. The Code unequivocally requires that administrative expenses be paid in full, in cash, on the effective date of the plan.[45] Because the evidence is undisputed that the Debtor does not otherwise have access to cash to pay the administrative claims in the approximate amount of $880,000, the Court finds that the new value contributions are necessary to the reorganization of the Debtor. Without them, the reorganization could not occur.

Comerica argues in a heading, but provided no evidence in support, that the new value contribution of either $480,000 or $1.2 million is not "sufficient."[46] It is not clear whether Comerica intended this argument to refer to the second requirement, that it be "substantial," or to the fifth requirement that it be "reasonably equivalent to the value or interest received." It appears to be intended as the former, as it is merely described as being too "meager" without any attempt to compare it to the value of the equity interest the Cowings will receive under the plan.

▆ Particularly in the absence of any evidence to the contrary, the Court finds, as a fact, that $480,000 is "substantial." I

do so on two independent bases. First, it is far from nominal or de minimis. To paraphrase Senator Everett Dircksen, a half million here and there pretty soon adds up to real money. I can take judicial notice that it is more than three times the annual gross salary of a U.S. Bankruptcy Judge. It is almost ten times the amount found insufficient in *Tucson Self–Storage*,[47] and fifteen times the amount found insubstantial in *Ambanc*.[48] It is more than four times the contribution the Seventh Circuit found insufficient in *Woodbrook*,[49] and almost 22 times larger than the contribution found insufficient in *Snyder*.[50] Second, although the Ninth Circuit expressly declined to hold that the comparison is appropriate, it is approximately 3% of the unsecured debt being discharged, more than six times the percentage that was found insufficient in *Ambanc*.[51]

▆ Finally, the Court finds, as a fact, that the $480,000 effective date cash contribution is more than reasonably equivalent to the value of the equity interests received by the Cowings and, in light of the expiration of exclusivity, satisfies the "top dollar" requirement of *203 North LaSalle*.

Prior to the Supreme Court's analysis in *203 North LaSalle*, the Ninth Circuit noted that the fifth new value requirement— equivalence to the value of the interest received—is the "most conceptually diffi-

45. Code § 1129(a)(9)(A).

46. Comerica Objection at 11 ("C. The Plan's Proposed 'New Equity' Infusion is Insufficient.").

47. *Oxford Life Ins. Co. v. Tucson Self–Storage, Inc.*, 166 B.R. 892, 899 (9th Cir. BAP 1994) ("Tucson's plan provides the Debtor's equity security holders or new investors will contribute a total of $50,000 to the Reorganized Debtor on the Effective Date.").

48. *Liberty National Enterprises v. Ambanc La Mesa Limited Partnership*, 115 F.3d 650, 655–56 (9th Cir.1997).

49. *In re Woodbrook Assocs.*, 19 F.3d 312, 320 (7th Cir.1994).

50. *In re Snyder*, 967 F.2d 1126, 1132 (7th Cir.1992).

51. 115 F.3d at 655 ("$32,000 is less than 0.5% of the total unsecured debt of approximately $4 million.").

cult prong of the new value corollary." [52] The conceptual difficulty exists because, from the inception of the absolute priority rule, the Supreme Court has indicated that there may be value being retained by equity interests due to retention of control of an insolvent enterprise, but has never indicated how the amount of that value is to be determined. On a balance sheet analysis, there is no value to the equity interest in a corporation when its debts exceed its assets. Yet in *Boyd*,[53] and reiterated in both *Case*[54] and *Ahlers*,[55] the Supreme Court held the absolute priority rule to be violated if old equity retained its interests "only for purposes of control," even if no dividends were in prospect. So we know there is value to such retained equity interests, and we are required to determine whether that value exceeds the amount of the new value contributions, but the Court has never suggested any legal, accounting or economic analysis or methodology by which that determination could be made.

The answer to this conceptual difficulty may be found in *203 North LaSalle*, which had not been decided when the Ninth Circuit called this the "most conceptually difficult prong" of the new value corollary. Like *Boyd*, *Case* and *Ahlers*, *203 North LaSalle* also focused on the value of control of the debtor and its assets. But unlike those precedents, *203 North LaSalle* for the first time pinpointed exactly where that value is found, and why it is not found in a balance sheet. While declining to define it as constituting "property," the Court found the problematic value to subsist in the plan's "provision for vesting equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan." [56] The Court made clear that it was the retention in the equity holders of the "exclusive opportunity to propose a plan" that caused a violation of the absolute priority rule. While declining to find it to be a "formal" "express option" right, the Court held that because "no one else could propose an alternative" plan, "the Debtor's partners necessarily enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusively entitled offeror or option holder." [57]

Thus Justice Souter's analysis in *203 North LaSalle* explains why the Court has always found (in *Boyd, Case* and *Ahlers* ) a retention of value that violates the absolute priority rule even when that value does not appear on a GAAP-prepared balance sheet—it exists in the option value of the exclusive right to propose a new value plan. It is not surprising that it has taken over a hundred years for the Court to start to identify the basis of that value. Economic analysis of option value is a relatively recent development, both in academia and in the markets,[58] that was certainly not understood when the absolute

---

52. *Id.* at 655.

53. *Northern Pac. Railway Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913).

54. *Case v. Los Angeles Lumber Products Co., Ltd.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

55. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

56. 526 U.S. at 454, 119 S.Ct. 1411.

57. *Id.* at 455, 119 S.Ct. 1411.

58. For example, the 1997 Nobel Prize in economics was given to Prof. Robert C. Merton and Prof. Myron S. Scholes for their development, in conjunction with Fischer Black, of the Black–Scholes formula for the valuation of an option, which was first published in 1973. Their work "laid the foundation for the rapid growth of markets for derivatives in the last ten years." "The Prize in Economics 1997—Press Release," Nobelprize.org, http: nobelprize.org/nobel_prizes/economics/

priority rule was originally adopted or when it was partially codified.[59]

But if the option value of the exclusive right to propose a plan is why the Court has always rejected the "no value" argument[60] in the context of a new value plan, then it also means there is no reason to reject the "no value" analysis when exclusivity has expired and there is no option value to the right to propose a plan. In other words, once exclusivity has expired, the value of the interest being retained should be determined based on either a pro forma balance sheet of the reorganized debtor or a capitalization of the reorganized debtor's projected income.

Neither expert who testified at confirmation attempted to determine an enterprise value of the reorganized debtor based on a present value of its projected income stream. Nor has either expert opined as to an enterprise value based on a multiple of the projected EBITDA, another common method of valuing an operating business based on its projected earnings. Either of those methods is probably more sound than determining value of the new equity interests simply based on a reorganized balance sheet.

The Debtor's CFO Dave Gonzales testified that based on a discounted projected cash flow, using an equity investor's discount rate of 25%, and assuming a terminal enterprise value based on multiple of three times EBITDA, the result was a negative equity in the range of $9 million. The Court allowed this testimony as to how the math works out, but did not allow Mr. Gonzales to testify to an opinion that the 25% discount rate or the 3 X EBITDA numbers were appropriate.[61]

But when expert opinion evidence of a discounted cash flow valuation is not available, the balance sheet approach supplies sufficient evidence to satisfy the preponderance of evidence standard applicable to confirmation of a plan, at least when there is no evidence to the contrary.[62]

laureates/1997/press.html (last visited April 14, 2011).

**59.** Indeed, Prof. Baird has demonstrated that the failure of leading academics such as Jerome Frank and William O. Douglas to consider the possible option value of equity interests in an insolvent entity underlay their rejection of the competing relative priority rule at the time the absolute priority rule was adopted. Douglas G. Baird, *Present at the Creation: The SEC and the Origins of the Absolute Priority Rule*, 18 AM. BANKR. INST. L. REV. 591, 604 (2010) ("[I]t is wrong to think that alternatives to absolute priority require old equity to have control, and asserting that the old equity is valueless merely restates the conclusion that its option value can be ignored in a reorganization.").

**60.** *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 207–08, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("We join with the consensus of authority which has rejected this 'no value' theory. Even where debts far excess the current value of assets, a debtor who retains his equity interest in the enterprise retains 'prop-

erty.' Whether the value is 'present or prospective, for dividends or only for purposes of control,' a retained equity interest is a property interest to 'which the creditors [are] entitled … before the stockholders [can] retain it for any purpose whatever' [citing *Boyd* ]. Indeed, even in a sole proprietorship, where 'going concern' value may be minimal, there may still be some value in the control of the enterprise; obviously, also at issue is the interest in potential future profits of a now-insolvent business.")

**61.** This testimony was also submitted in paragraphs 180–182 of the Gonzales' Declaration, but that testimony was not admitted due to Comerica's objection that it was expert testimony that was not timely disclosed. The Court sustained a similar objection to Mr. Gonzales' live testimony as to his opinions, but overruled the objection as to the mathematical calculations.

**62.** *Liberty National Enterprises v. Ambanc La Mesa Limited Partnership,* 115 F.3d 650, 653 (9th Cir.1997) ("The bankruptcy court must

It is stipulated that Comerica's claim that must be paid under the plan is in excess of $15 million, and that the value of the Debtor's assets is $10 million. Consequently upon the effective date of the plan the reorganized debtor will be insolvent on a balance sheet basis, even considering the new value contribution, whether it be regarded as having a balance sheet value of $480,000 or $1.2 million. Because the reorganized debtor will be balance sheet insolvent, there will be no value to its equity interests. Compared to this zero value for the equity in the reorganized Debtor, the new value contributions substantially exceed that value, whether they be regarded as having a value of either $480,000 or $1.2 million. Because exclusivity has expired long ago, the Court finds as a fact that there is no "option value" (or any other value within the contemplation of *Boyd, Case, Ahlers* or *203 North LaSalle*) to the exclusive right to propose a new value plan or to be the contributors of that new value. Therefore the Court finds as a fact that the value of the new value contributions substantially exceeds the value of the equity interests that the Cowings will receive under the plan.

## Conclusion

For these reasons, the Court finds and concludes that the First Amended Plan satisfies all of the requirements of § 1129(a) and (b), that the objections of Comerica must be denied, and that the plan must be confirmed. Counsel for Debtor is requested to upload a form of order of confirmation, which when entered shall be the final, appealable order.

confirm a Chapter 11 debtor's plan of reorganization if the debtor proves by a preponderance of the evidence" that it satisfies the requirements of Code § 1129(a) and (b)).